# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5090-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

C.B.,

     Defendant-Appellant.

_____

Submitted January 13, 2020 – Decided May 1, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 17-06-0969.

Moriarty Law Firm, attorneys for appellant (Charles Moriarty, of counsel; Timothy C. Moriarty, on the brief).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel J. Marzarella, Chief Appellate Attorney, of counsel; Roberta DiBiase, Supervising Assistant Prosecutor, on the brief).

PER CURIAM

Defendant C.B. was charged in a nine-count indictment after his daughter, W.B.,[1] reported to the Ocean County Prosecutor's Office in November 2016 that he had sexually assaulted her on numerous occasions between 2005 and 2012 when she was between the ages of six and twelve.[2] Defendant appeals from his conviction by jury for first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (counts one, four and seven); second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts two, five and eight); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1)(counts three, six and nine). On appeal, he argues:

> [POINT I]
>
> V.H. AND J.M. SHOULD NOT HAVE BEEN PERMITTED TO TESTIFY BECAUSE THEIR TESTIMONY DID NOT MEET THE REQUIREMENTS OF THE FRESH-COMPLAINT EXCEPTION TO THE HEARSAY RULE.
>
> [POINT II]
>
> DEFENDANT WAS DENIED A FAIR TRIAL BECAUSE THE TRIAL COURT IMPROPERLY PERMITTED HEARSAY EVIDENCE BY NUMEROUS WITNESSES, AND IMPROPERLY

---

[1] We use initials to protect the privacy of W.B. See N.J.S.A. 2A:82-46; R. 1:38-3(9), (12).

[2] W.B.'s date of birth is March 30, 1999.

2

ALLOWED EVIDENCE AND TESTIMONY THAT WAS MORE PREJUDICIAL THEN PROBATIVE.

A. Testimony by Detective Alexander Regarding Defendant Purchasing Airline Tickets to Brazil and Defendant Traveling to Various States Outside of New Jersey.

B. Court Improperly Permitted the State to Introduce Recorded Telephone Conversation Between W.B. and Defendant over the Defense's Objection to Same.

[POINT III]

THE PROSECUTOR IMPROPERLY VOUCHED FOR THE TESTIMONY OF A KEY WITNESS IN THE CASE DEPRIVING DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

[POINT IV]

DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE AND THE TRIAL COURT'S DETERMINATIONS AND FINDINGS AS TO THE APPLICABLE AGGRAVATING AND MITIGATING FACTORS ARE CLEARLY ERRONEOUS AND NOT SUPPORTED BY COMPETENT CREDIBLE EVIDENCE; THEREFORE, DEFENDANT'S SENTENCE MUST BE VACATED.

A. The Trial Court Engaged in Impermissible Double-Counting in Finding Aggravating Factor Two Applied to Defendant.

A-5090-17T4

B. The Trial Court Improperly Evaluated Defendant's Risk to Reoffend and the Trial Court's Determination that Aggravating Factor Three Applied is Not Supported by Competent Credible Evidence.

C. The Trial Court's Findings with Respect to Aggravating Factor Nine Are Not Supported by Competent Credible Evidence.

D. The Court's Imposition of a Sentence at the Upper Limits Cannot Stand as the Court Improperly Determined the Aggravating Factors Outweighed the Mitigating Factors.

We affirm but remand for resentencing.

I.

Following the State's in limine motion to admit the testimony of two witnesses to whom W.B. had disclosed defendant's actions, and defendant's cross-motions to bar those witnesses' testimony, the trial court heard testimony at an N.J.R.E. 104 hearing from both witnesses. Defendant argues the court erred in ruling their testimony was admissible as fresh complaint; both testified at trial, as did W.B.[3]

---

[3] Fresh-complaint testimony is admissible only if the victim testifies at trial. See State v. Hill, 121 N.J. 150, 151 (1990).

We review a trial court's decision to introduce fresh-complaint testimony at trial for an abuse of discretion. See State v. Bethune, 121 N.J. 137, 145-48 (1990). "Trial judges are entrusted with broad discretion in making evidence rulings." State v. Muhammad, 359 N.J. Super. 361, 388 (App. Div. 2003). As such, "[a] reviewing court should overrule a trial court's evidentiary ruling only where 'a clear error of judgment' is established." State v. Loftin, 146 N.J. 295, 357 (1996) (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)).

Although an out-of-court statement offered to prove the truth of the matter asserted therein is inadmissible hearsay, N.J.R.E. 801, fresh-complaint testimony by the victim of a sexual offense is admissible for a narrow purpose: "to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated," State v. R.K., 220 N.J. 444, 455 (2015). "[T]o qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, [and] to a person the victim would ordinarily turn to for support." Ibid. "A witness may testify only to the general nature of the complaint, and unnecessary details of what happened should not be repeated." State v. W.B., 205 N.J. 588, 617 (2011). Because fresh complaint evidence cannot be used to bolster the victim's credibility, R.K., 220 N.J. at 456, trial courts "may, but need not,

exclude cumulative fresh-complaint testimony that is prejudicial[,]" Hill, 121 N.J. at 170.

W.B. made a non-specific disclosure that defendant "had done things to her which was implied in a sexual manner . . . [and] that he would hold her down in his bed," to her lifelong, close friend, V.H., when they were younger than ten years of age—and while defendant's sexual assaults of W.B. were ongoing. Defendant does not claim that disclosure did not meet the criteria for admission as fresh complaint. Defendant argues V.H.'s testimony was unreliable because her version of events differed significantly from W.B.'s recollection and included "force, fear and violence" never mentioned by W.B. Defendant further contends a subsequent conversation between W.B. and V.H. "as [fifteen]-year-olds," and an inquiry of V.H. by W.B.'s mother, K.B., if W.B. had ever said anything about defendant, tainted the initial fresh complaint.

These bald assertions do not render V.H.'s testimony inadmissible. Defendant concedes in his merits brief:

> V.H. never revealed what W.B. said to her on the second occasion other than that "she had told me she told her boyfriend about [the sexual assaults]." . . . V.H. never delineated what information she received from W.B. on that second occasion, what additional details she gleaned from the second conversation, and how that information may have caused her to revise her

A-5090-17T4

understanding of the sexual abuse W.B. was alleging to have experienced.

Not only is defendant's argument unsupported by the record, it fails to consider that fresh-complaint testimony "is not evidence that the sexual offense actually occurred, or that [a victim] is credible. It merely serves to negate any inference that because of [a victim's] assumed silence, the offense did not occur." Model Jury Charges (Criminal), "Fresh Complaint" (rev. Feb. 5, 2007). Thus, because fresh-complaint testimony "does not prove the underlying truth of the sexual offense," ibid., and the account of the disclosure is limited to "the general nature of the complaint," avoiding "unnecessary details of what happened," W.B., 205 N.J. at 617, it is of no moment that V.H.'s testimony may have differed from W.B.'s full disclosure. The State did not introduce, and the jury did not hear, detailed testimony from V.H., including her statement about "force, fear and violence." The trial court did not abuse its discretion in admitting V.H.'s fresh-complaint testimony.

J.M. was W.B.'s boyfriend of approximately four to five months in the summer of 2016. Defendant also argues the trial court erred in allowing J.M.'s fresh-complaint testimony that W.B. and he were "talking on the phone one night and she was very clearly upset"—"crying, very anxious [and] scared"—causing him to ask "repeatedly," "a few times" "what the problem was" "because

[he] could see very clearly that it was not nothing wrong or not something that should be taken lightly." W.B. finally told him her father had "molested her" from the time she was six-years-old until she was twelve.[4] J.M testified he did not ask W.B. if she "was sexually abused by her father." J.M. said he immediately drove to W.B.'s home and continued the conversation; W.B. told J.M. what her father made her do "and that this was probably a huge cause of all of her anxiety."

Defendant contends J.M.'s testimony did not meet the fresh-complaint criteria for admissibility because he repeatedly questioned W.B. before she disclosed and that disclosure was made approximately four years after the defendant's last alleged assault in 2012. We disagree. As the trial court found, J.M. repeated his questions without knowing "anything about an alleged complaint or problem that the victim had with . . . defendant." The court discounted J.M.'s prior statement to a detective that he "pushed [W.B.'s disclosure] out of her," finding from his testimony "that that was really not the proper explanation as to what happened," and that J.M. did not interrogate or force W.B. to disclose her father's abuse. Indeed, J.M.'s repeated questions to

---

[4]  J.M. described the molestation in more detail at the N.J.R.E. 104 hearing. Throughout this decision we have refrained from describing the sordid sexual acts, only because a vivid account is not required for our determination.

his distraught girlfriend were aimed at finding out what was upsetting her. "[G]eneral, non-coercive questions do not rob a complaint of its admissibility under the fresh-complaint rule." Bethune, 121 N.J. at 144 (holding questions such as, "what's wrong?" and "[d]id he do something to you?" did not constitute a coercive line of questioning (quoting People v. Evans, 173 Ill. App. 3d 186, 191 (1988))).

The disclosure, some four years after the last alleged act, bears close scrutiny. Notwithstanding that fresh complaints of sexual assault must be made within a reasonable time, that requirement "must be 'applied more flexibly in cases involving children than in [cases] involving adults.'" W.B., 205 N.J. at 618 (alteration in original) (quoting State v. L.P., 352 N.J. Super. 369, 382 (App. Div. 2002)). In deference to a child's "special vulnerability to being cajoled and coerced into remaining silent by their abusers, courts allow children additional time to make a fresh complaint." Bethune, 121 N.J. at 143. Such an accommodation also recognizes "the reluctance of children to report a sexual assault and their limited understanding of what was done to them." State v. P.H., 178 N.J. 378, 393 (2004).

The trial court found W.B.'s disclosure to J.M. was made within a reasonable time considering the difficulty young victims have in disclosing

abuse by someone with whom they have a close relationship.  The court explained the timing of the disclosure

> was reasonable because a relationship was developing between [W.B. and J.M.] for some period of time while they were dating, and that trust between two people developed to the point where . . . the statement was made within a reasonable time of the occurrence because the relationship became stronger and clearly there was more trust between the two individuals.

Noting the complexity of such situations, the trial court recognized that the development of sufficient trust is an "ongoing process," making the time period reasonable.

> We have recognized that a greater

> lapse of time between the assault and the complaint may be permissible if satisfactorily explainable by the age of the victim and the circumstances surrounding the making of the complaint.  For example, in State v. Hummel, 132 N.J. Super. 412, 423 [(App. Div. 1975)], a period of three years between assault and complaint was allowed where the fifteen-year-old victim had been repeatedly raped over a three-year period and had just been removed from her abuser, thereby freeing her from the bonds of a paralyzing fear. The remoteness of the complaint from the abuse was found to affect only the probative value, not the competency, of the evidence.

> [State v. Pillar, 359 N.J. Super. 249, 281-82 (App. Div. 2003).]

The lapse between a juvenile victim's complaint and the last act must be adequately explained, W.B., 205 N.J. at 618-619 (recognizing that the two-year delay was justified because the victim was "scared" and in a state of "open rebellion" against her mother); longer delays typically require a showing of threats or coercion, see e.g., Hummel, 132 N.J. Super. at 423 (noting that the reason for the victim's delay was because her abuser threatened to put her away in a shelter if she spoke); L.P., 352 N.J. Super. at 384 (finding that the delayed complaint was justified because the victim "continued living with defendant . . . and defendant had warned [her] that he would kill her if she told anyone about the sexual abuse").

Reflecting her "limited understanding" of what was done to her when she was six years-old, at a time when defendant still lived with her, her mother and her brother, see P.H., 178 N.J. at 393, W.B. testified she was "unfazed" by the abuse that occurred while her mother was at work because "[a]t six years[-]old, you don't know any better, you're not fully taught what's right or wrong[.]"

During the abuse that occurred during bi-weekly weekend parenting time at defendant's father's house when W.B. was "around eight to tenish," defendant first told W.B. not to tell anyone because if she "said anything that he could get . . . in very serious trouble and [she] wouldn't see him anymore." After W.B.

told V.H. about the abuse, and defendant moved to two locations in Woodbridge Township between 2010 and 2012, when W.B. was between ten or eleven and thirteen years-old, the assaults continued during bi-weekly parenting time. From the record, we observe W.B. did not tell anyone about the abuse, including her mother, from her initial disclosure to V.H. before they were ten years-old until she told J.M.

Although there is no evidence defendant threatened or forced W.B. to remain silent, he did play on her emotions for him after defendant moved from the marital home. W.B. told the jury about her relationship with defendant:

> Before everything came out, I was able to have a relationship with my dad and we would go out to lunch, we would hang out, we would go jeeping together which is like mudding in a Jeep, pretty standard stuff, but I was able to build a relationship with him.

She explained, "I just disassociated what he did from him. Like it was a different person, like what he did was completely different from who he was. And I just disassociated that so he was still my dad and was able and easier to have a relationship with him." She said she loved her father, and since she came forward:

> I don't talk to half my family now. I'm missing a whole person from my life. I don't have someone to walk me down the aisle. My kids aren't going to have a grandpa, and I'm just missing such an important figure from my

12

life. We were supposed to learn how to do things together. He was supposed to teach me how to fix cars and help me with my car problems and just be a dad and I'm missing that now.

Even at age ten, she realized her father would face punishment if she disclosed, asking V.H. to keep secret their conversation because W.B. "didn't want her dad to get in trouble." And, J.M. told the jury, she never told anyone besides V.H. because she "was afraid she would get in trouble and she thought that it might have been her fault and people would be mad at her."

When she told J.M., she had no apparent confidante. There is no evidence she told V.H. about the continued abuse after her initial disclosure. She never sought her mother's help at any time. In fact, she "took a shot" thinking she "might as well try" to get defendant to stop the assaults, and confronted her father around her thirteenth birthday. She told him "that what he was doing was wrong." After "that he basically just did stop."

After she confronted her father, she wanted to see a therapist a year to six months prior to her mother beginning that process in November 2016, by asking defendant about health insurance coverage for the sessions. She had not begun therapy when she told J.M in the summer of 2016. Under those circumstances, although the four-year period between the last act and W.B.'s disclosure to J.M. was lengthy, we agree with the trial court that W.B. did not have a trusted person

13

to tell of the longstanding abuse until then. She apprehended the repercussions to her and defendant that did ensue once disclosure was made to her mother, albeit by her father's reaction to the request for health insurance coverage for the therapy sessions. She told the man, to whom she would become affianced, of the continued abuse only after they had developed a relationship she could trust; even then, she was distressed when she made that disclosure. The trial court did not abuse its discretion in finding the disclosure to J.M. was made within a reasonable time.

We reject defendant's contention that the trial court erred in allowing fresh-complaint testimony from both V.H. and J.M. V.H.'s testimony involved the very early assaults by defendant. J.M.'s testimony covered assaults over an additional two years, well after the disclosure to V.H. that occurred when W.B. was less than ten years-old. Absent J.M.'s testimony, the jury may have thought that W.B.'s failure to complain about the assaults that continued after she was ten years-old were fabrications. It was within the judge's discretion to allow both witnesses' testimony "to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated," R.K., 220 N.J. at 455, including W.B.'s silence about the continued abuse after she told V.H, see Hill, 121 N.J. at 170 (holding trial courts "may, but need not, exclude cumulative fresh-

complaint testimony that is prejudicial"); see also State v. Taylor, 226 N.J. Super. 441, 453 (App. Div. 1988) (holding "[w]ithout evidence of the second complaint, a jury might have thought that if the child did not recount the events to her mother at the first opportunity, the events may have been a fabrication of either the child or her aunt").

## II.

Defendant also advances several additional arguments that the trial court erred in admitting evidence.

## A.

Defendant argues the trial court erred by denying his motion in limine to exclude evidence at trial of a telephone conversation between W.B. and defendant that was recorded by the Prosecutor's Office and played to the jury during the State's case-in-chief. The call began with a cordial, innocuous conversation before W.B. told defendant that her mother informed her that defendant asked why W.B. was looking for a therapist. Her mother testified that she asked defendant about health insurance coverage for therapy sessions on the day prior to the recorded conversation. When defendant replied, "Oh, yeah, to make sure everything was going okay," the following colloquy ensued:

> [W.B.]: Well, I think we both know the reason why I'm asking for a therapist.

[DEFENDANT]: (Inaudible.)

[W.B.]: So –

[DEFENDANT]: Okay.

[W.B.]: I mean, you said you wanted to, you know, try and be part of . . . my life, but I don't, like, going to a therapist is not to get you in trouble, its just so I can actually have closure on what happened because we both know what happened wasn't okay.

[DEFENDANT]: (Inaudible.)

[W.B.]: So.

[DEFENDANT]: So. You do whatever you have to do to get better, sweetheart.

[W.B.]: I mean –

[DEFENDANT]: I love you (inaudible).

[W.B.]: Yeah, I love – what? Hello?

[DEFENDANT]: All right. Take care sweetie.

[W.B.]: Wait, why are you – wait. Where are you going?

[DEFENDANT]: No, I just –

[W.B.]: No, but I . . . called you to talk.

[DEFENDANT]: All right. I just –

[W.B.]: What's wrong? You don't sound okay.

[DEFENDANT]: I'm okay. It's okay.

16

[W.B.]: I really, I don't make – I don't want you to feel like [bad] about the situation, like –

[DEFENDANT]: No.

[W.B.]: But, I don't know.

[DEFENDANT]: Want you to be happy.

[W.B.]: Is there anything you have to say about it at least?

[DEFENDANT]: No.

[W.B.]: There's no apology for basically ruining my life, a little bit? Because we all know, like, that [messed] someone up.

[DEFENDANT]: I don't – I can't – I don't want to talk about this on the phone.

[W.B.]: But why not?

[DEFENDANT]: I just don't.

[W.B.]: Well, I can't talk to you in person about it because [we] all know how it's going to end, and it's not going to be well.

[DEFENDANT]: Have a good Thanksgiving, okay.

[W.B.]: Why are you trying to leave? Like – you don't, you don't even have like a single remorse for what you did? How is that fair to me? There's not one apology you could possibly have, because, you know, this happened for like six years, right? There's not a single apology?

[DEFENDANT]: Oh, there's lots of apologies.

17

[W.B.]: Well, you said you wanted to try to and make things better but you still have not even brought up the biggest issue that there is.

[DEFENDANT]: No.

[W.B.]: So why don't we address it?

[DEFENDANT]: I can't right now, I'm sorry.

[W.B.]: Why not?

[DEFENDANT]: I can't.

[W.B.]: All right. Well, everything has been on your time. So why can't this be on my time?

[DEFENDANT]: I'll call you back in a little bit.

[W.B.]: No, like, why can't we just talk now? Are you with someone right now?

[DEFENDANT]: I told you I'm – I'm – I'm –

[W.B.]: You just said you were outside.

[DEFENDANT]: Yeah, but I can't talk right now, I'm sorry.

[W.B.]: Why?

[DEFENDANT]: Can't.

[W.B.]: But I'm ready to talk.

[DEFENDANT]: Sweetie, I love you.

[W.B.]: No, obviously, you don't, though. There's no apology or anything?

18

[DEFENDANT]: There's [an] apology, I'm sorry, I'm sorry, I was a horrible parent, I was never there.

[W.B.]: That's no, that's – you not being there is not what I'm asking for – he really just hung up on me.

Defendant contends the recording was inadmissible because it is ambiguous. Trial counsel argued defendant was apologizing for being "a horrible parent," not about allegations of sexual assault which were never specified by W.B. during the conversation. As such, the "ambiguous nature of the conversation . . . invited unconstitutional speculation rendering the call unduly prejudic[ial]." Defendant also argues that the prosecutor's claim to the jury during summation that the "true meaning" of defendant's failure to address W.B.'s allegations and his apology constituted an admission of guilt.

The trial court, after a N.J.R.E. 104 hearing at which the recording was played, ruled the conversation was relevant and it would be up to the jury to determine if anything was to be derived from the recording in the context of all of the evidence adduced at trial, after hearing both parties' views about the recording's content. Although "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice[,]" N.J.R.E. 403; State v. Covell, 157 N.J. 554, 573 (1999), we review a trial court's decision on that issue, affording "substantial deference to the

19

evidentiary rulings of a trial judge," Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 319 (2006). Thus, our review of evidentiary decisions implicates the abuse of discretion standard, where a reversal will occur only where the trial judge's decision was "a clear error of judgment." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (quoting Koedatich, 112 N.J. at 313).

Considering the remarks made by W.B. during the conversation, and other evidence, defendant's statements in the recorded conversation were not so ambiguous as to require exclusion. W.B. told defendant in the beginning of the pertinent conversation, "I think we both know the reason why I'm asking for a therapist." W.B.'s mother testified that on the day prior to the conversation, when she raised the subject of insurance coverage for therapy to defendant, defendant "was nervous, he was scared, he was very childlike." When he informed K.B. "about a notebook that had passwords and bank account information in it," K.B. asked him why he was advising her of that information. K.B. said defendant replied "that because as soon as [W.B.] spoke to a therapist they were going to have to call the cops and he couldn't live in jail."

W.B. commented that she was not seeing a therapist to "get [defendant] in trouble," but to "actually have closure on what happened because we both know what happened wasn't okay."  She continued:

> [Y]ou don't even have like a single remorse for what you did? How is that fair to me? There's not one apology you could possibly have, because, you know, <u>this happened for like six years</u>, right? There's not a single apology?
>
> [(Emphasis added).]

That evidence sufficiently strengthened the probative value of the recording to justify the trial court's finding that the prejudice caused by any ambiguity did not outweigh that value.  The jury could consider defendant's demeanor and his responses during the conversation in determining the parties' dueling interpretations of the issue being discussed.  As the trial court instructed the jury, it had to first determine if the statement was made by defendant and, if made, whether it was credible.  The instruction, which conformed substantially to the model charge, <u>Model Jury Charges (Criminal)</u>, "Statements of Defendant" (rev. June 14, 2010), placed the conversation's context in the hands of the jury.

In a single sentence, without any explanation, defendant argues the recording's "admission was improper pursuant to [N.J.R.E.] 803(b)(1) and [N.J.R.E.] 104."  Defendant's contention cannot be considered an

21

argument. N.J. Dep't of Envtl. Prot. v. Alloway Twp., 438 N.J. Super. 501, 506 n.2 (App. Div. 2015) (finding that an issue raised in "a single sentence in [defendant's] brief," was waived because defendant provided no supporting legal argument). Although the N.J.R.E. 104 hearing at which the recording was played does not present as a traditional N.J.R.E. 104(c) hearing at which the trial court must determine if the State proved defendant's statement was voluntary, see State v. Miller, 76 N.J. 392, 404-05 (1978), defendant does not argue that the conversation with his daughter was not voluntary.[5] Moreover, after listening to the recording and arguments of counsel the trial court found "there [was] no legal reason, no evidentiary reason to keep this statement out at this time." As such, we find no merit in defendant's syncopated argument.

B.

Defendant further argues the trial court erred in admitting hearsay testimony elicited from the case detective over his objection. Specifically, in his merits brief defendant asserts the detective's "testimony regarding defendant purchasing a one-way ticket to Brazil and travel[ing] out of state . . . constituted inadmissible hearsay"; should have been excluded as more prejudicial than

---

[5] When the CD of the recording was moved into evidence by the State, defendant had no objection.

probative; and, although the State "intimated that the evidence indicated a consciousness of guilt," the court's denial of the State's request for a flight charge prejudiced defendant.[6]  The detective testified that the day after the recorded conversation, "defendant purchased and subsequently cancelled airline travel from Newark Liberty International Airport . . . to Orlando, Florida, continuing to Sao Paulo, Brazil"; the ticket was one-way.  Defendant did not object to that testimony.  As such we will view it under the plain error standard. "Under that standard, a conviction will be reversed only if the [alleged] error was 'clearly capable of producing an unjust result[.]'"  State v. McGuire, 419 N.J. Super. 88, 106 (App. Div. 2011) (quoting R. 2:10-2).  Defendant must present evidence "sufficient to raise a reasonable doubt as to whether the error

---

[6]  In the statement of facts of his merits brief, defendant mentions another instance during the trial when a hearsay objection was made to the detective's testimony that defendant's sister "reported the defendant missing or in danger because [he] failed to show up for work."  In the statement of facts, he also mentions the detective's testimony that "there was [an] indication that [d]efendant attempted to conceal his whereabouts by using cash and removed his license plate from his vehicle at various times," and by calling from restricted phone numbers; there was no objection lodged to that testimony which was elicited during cross-examination.  Several other hearsay objections were lodged at trial but were not addressed in defendant's merits brief.  Defendant did not advance any argument about any of the foregoing testimony in his merits brief. As such we will consider them abandoned.  See State v. Press, 278 N.J. Super. 589, 596 (App. Div. 1995) (determining that an "issue [that] was not briefed or argued . . . should not [be] address[ed]"); State v. L.D., 444 N.J. Super. 45, 56 n.7 (App. Div. 2016) ("[A]n issue not briefed is waived.").

led the jury to a result it otherwise might not have reached[.]" Id. at 106-07 (alteration in original) (quoting State v. Taffaro, 195 N.J. 442, 454 (2008)). In other words, he must establish that the error "was clear and obvious and that it affected [his] substantial rights." Id. at 107.

Defendant did interpose a hearsay objection to the detective's testimony that defendant travelled to various states. If an objection is made, we review the trial court's evidentiary holding under the harmless-error standard, see State v. Reeds, 197 N.J. 280, 297-98 (2009), and will only reverse its decision if the error "is of such a nature as to have been clearly capable of producing an unjust result[,]" State v. R.B., 183 N.J. 308, 330 (2005) (quoting R. 2:10-2); see also State v. Macon, 57 N.J. 325, 337-38 (1971) (noting that "the same ultimate standard applies whether the error was objected to below or whether the error was first claimed upon appeal").

The detective told the jury that "[d]uring the course of our investigation, we learned that . . . defendant was . . . scheduled to spend Thanksgiving[—the day after the recorded conversation—]at his sister's residence" but did not attend. At a sidebar conference following defense counsel's hearsay objection because the information was given to the State by defendant's sister, the assistant prosecutor tried to justify the testimony, contending it was "derived from

24                                                                          A-5090-17T4

numerous sources," not just from what defendant's sister said. The assistant prosecutor continued:

> It's basically based upon a lengthy investigation, it's based upon numerous different things including numerous records that we viewed in determining where the defendant's whereabouts are.
>
> It's relevant because . . . defendant was ultimately apprehended in Alabama. So during Thanksgiving, the State was just trying to proffer the fact that he was in Alabama which is, has a direct correlation to the case, specifically that's where he was located. So we have to be able to put that in some type of context, so that was pretty much what we were eliciting it for. We didn't elicit any type of hearsay statement. I believe that counsel is right to the fact that this conversation was documented in a conversation with [defendant's sister] but we're not eliciting it as to what [defendant's sister] said, and furthermore, this was documented in numerous, numerous records as well independent from what [defendant's sister] was saying.

The trial court queried if the testimony was admissible "not for the truth of what someone told an investigator about [where] a person would be, but rather for the purpose of making the jury aware of what investigation went towards finding this information[.]" The assistant prosecutor, unsurprisingly, agreed with the argument she had not theretofore raised. Yet, the assistant prosecutor admitted that she was seeking to elicit that defendant travelled to Alabama after the recorded conversation, "which is tying into where he [was] ultimately found"

25

and arrested.  The trial court overruled defendant's objection, finding the testimony relevant, not introduced to prove the truthfulness of the statement, and "properly admissible as an exception[.]"

The detective then testified defendant went to Alabama, where his cousin was located, during the Thanksgiving holiday, and returned to New Jersey, "[a]ccording to credit[-]card records," on December 5, 2016; defense counsel again objected on hearsay grounds.  The trial court allowed the testimony, asking the assistant prosecutor to "lay a little more foundation" about the credit cards. Without complying with the judge's instruction, the assistant prosecutor asked the detective if he knew when defendant returned to New Jersey.  The detective replied defendant "made contact with the New Jersey State Police" on December 10, 2016.

Later, when the detective testified he had no further contact with defendant in New Jersey after December 23, 2016, the assistant prosecutor asked, "where did [the detective] believe . . . the defendant went" after that date?"  The detective answered, "based on records, it appeared as if the defendant was in multiple states[.]"  Defense counsel objected on hearsay grounds.  At sidebar, the assistant prosecutor asserted:

> Judge, the State would just place on the record that it's not hearsay, he is basing this on his investigation.  The

detective gets on the stand, he's allowed to testify as to what happened in the investigation. There were numerous records in this case which were turned over to defense counsel. They were turned over as certified business record documents. He's certainly allowed to testify as to his conclusions about the investigation.

So at this point in time, it is the State's position that this type of testimony is admissible. I mean there was numerous, numerous search warrants done in terms of finding out the defendant's whereabouts as to where he went and where he didn't go. Now, the State would understand if we tried to elicit a particular hearsay statement that, you know, Barbara told me he was here, but that's not what we're doing. We're basically giving a summary based upon the voluminous records which were certified and we're not offering any type of statement at this time.

After the trial court confirmed that defense counsel received from the State records of credit-card usage, airline ticket purchases, and attendance records from defendant's employer, defense counsel explained that he objected because the detective's "opinion" was derived from documents which were not established as hearsay exceptions; that is, the State did not lay a foundation establishing that they were business records. The trial court ruled:

If a detective goes out and investigates a case and obtain[s] records, for instance, from a business, from a place where a person works, that is part of the investigation, in this [c]ourt's opinion, and he's allowed to testify to that. [Defense counsel is] allowed to cross-examine if [he] want[s] to use the records or anything like that.

The court also determined the State was not seeking to introduce the documents; the detective was "testifying from his investigative reports"; and that the records from which the detective was opining as to defendant's travels were not hearsay, but were "records from a business."

The State also introduced at trial text messages between defendant and W.B. that were taken from W.B.'s phone. Defense counsel objected that these messages constituted inadmissible hearsay. The trial court overruled the objection, stating "they are not hearsay at this time, not being offered for the truth but that are part of an investigation in this matter."

Just after the recorded conversation, W.B. texted defendant and asked, "[w]hy'd you hang up?" and "[w]hen are you going to, gonna call back, call me back, I'm sorry." Defendant replied, "Sorry, had to go. Have an errand. Call you on Friday." Additional text messages, collected from W.B's phone during November 22, 2016 to January 22, 2017, were also introduced. One of the text messages from W.B.'s phone, sent on December 18, 2016, stated, "I'm not surprised you ran again, but you are making my life hell right now and you're pissing me off. Take responsibility for your actions"; to which defendant responded "I'm sorry I'm making your life hell." Defendant now argues "the admission of the text messages, specifically, the one in which W.B. asks

defendant, 'why he is running[,]' should never have been admitted, and if admitted, required the [c]ourt to issue a limiting instruction."

The specific text message was, like the recorded conversation, a hearsay exception if it was defendant's statement.  N.J.R.E. 803(b)(1).  We note the trial court did not conduct a N.J.R.E. 104(c) hearing to determine if the statement was voluntary or to determine the prejudicial impact of, not only defendant's statement, but also that of the prompting text from W.B.  Defendant, however, objected only on hearsay grounds. He does not contend that defendant's text to his daughter was not voluntary.  He does not contend, as he did with the recorded conversation, that the statement was more prejudicial than probative.  We also note the trial court, as it did with defendant's statements in the recorded conversation, instructed the jury it had to first determine if the statement was made by defendant and, if made, whether it was credible.  Again, the instruction conformed substantially to the model charge, see Model Jury Charges (Criminal), "Statements of Defendant," and placed the conversation's context in the hands of the jury.  But, for reasons which we will discuss at length, W.B.'s comment that defendant was running again was, on the record before us, inadmissible.

The trial court erred in determining the detective could testify from records, even if defense counsel received them in discovery. The assistant prosecutor did not establish that any of the records were admissible as hearsay exceptions; she simply stated they were. A proper foundation must always be laid before business records can be admitted into evidence. See State v. Martorelli, 136 N.J. Super. 449, 453 (App. Div. 1975). "The requirement that a foundation be laid establishing the criteria for admissibility [of the business records] may be met by the kind of proof that would satisfy a trial judge in a hearing under [N.J.R.E.] 104(a), including proof presented in affidavit form[.]" Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, 1991 Supreme Court Committee Comment on N.J.R.E. 803(c)(6) (2019). To achieve that end, a trial judge should normally examine the records during a N.J.R.E. 104 hearing to determine the manner of their preparation and ensure that all requirements of N.J.R.E. 803(c)(6) are satisfied before allowing the documents to be admitted into evidence.[7] N.J. Div. Youth & Family Servs. v. E.D., 233 N.J. Super.

---

[7] Under the "Records of Regularly Conducted Activity" exception to the hearsay rule ("business records exception"), documents or records may be exempt from the hearsay rule if they meet three criteria:

> First, the writing must be made in the regular course of business. Second, it must be prepared within a short

401, 413 (App. Div. 1989); see also Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 803(c)(6) (2019). Alternatively, a custodian of records or other qualified witness can testify that the proffered records meet the required N.J.R.E. 803(c)(6) criteria. See Konop v. Rosen, 425 N.J. Super. 391, 402-04 (App. Div. 2012); Hahnemann Univ. Hosp. v. Dudnick, 292 N.J. Super. 11, 17-18 (App. Div. 1996) (noting that a witness must be qualified before laying the necessary foundation for computer records to be admitted into evidence at trial). For example, we have determined

> [a] witness is competent to lay the foundation for systematically prepared computer records if the witness (1) can demonstrate that the computer record is what the proponent claims and (2) is sufficiently familiar with the record system used and (3) can establish that it was the regular practice of that business to make the record. If a party offers a computer printout into evidence after satisfying the foregoing requirements, the record is admissible "unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy."
>
> [Hahnemann, 292 N.J. Super. at 18 (citation omitted) (quoting N.J.R.E. 803(c)(6)).]

---

> time of the act, condition or event being described. Finally, the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence.
>
> [State v. Matulewicz, 101 N.J. 27, 29 (1985).]

31                                                                      A-5090-17T4

See also Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 380 (2007) ("All that is needed to lay the foundation for the admission of systematically prepared . . . records otherwise qualified as business records is if 'the witness (1) can demonstrate that the . . . record is what the proponent claims and (2) is sufficiently familiar with the record system used and (3) can establish that it was the regular practice of that business to make the record.'" (quoting Hahnemann, 292 N.J. Super. at 18))). Finally, an affidavit may be sufficient to lay a proper foundation for the records under certain circumstances. Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, 1991 Supreme Court Committee Comment on N.J.R.E. 803(c)(6) (2019).

The detective was not able to introduce the hearsay statements from the records or any other source unless the trustworthiness of the source was established. The detective was not a permissible conduit for the introduction of inadmissible hearsay; "case detective" is not a hearsay exception. And, we disapprove of the trial court's admission of hearsay evidence as explaining the State's course of investigation.

The trial court's determination that the testimony was not hearsay because it was not offered to prove the truth of the matter was misguided. In her summation, the assistant prosecutor linked the detective's testimony about

32

defendant's travel and the text messages to defendant's knowledge of the subject

of his recorded conversation with W.B., stating:

> Text messages, which were marked S-2, these are crucial because they show you exactly what was happening while this was going on. If you look to the bottom of these, on the date of November 22[], you can see specifically the defendant and how this is imploding for him because what is he doing? He's trying to contact [W.B.]. He says, hey, did you get rid of Snap Chat? I don't see you as my friend anymore, [W.B.] Then he says, I can't add you either.
>
> [K.B.] testified that on [November 22], . . . defendant was trying to get in touch with them. It's more telling is that you can see during the course of these text messages when the consensual is over, and [W.B.] asked her father, why did you hang up? When are you going to call me back? You know what his response to her is? Sorry, had to go, have an errand, call you on Friday. That's what he said to her. At any time during this consensual, at any time in these text messages, at any time does the defendant ever once say to [W.B.], [W.B.], what are you talking about? I didn't do this, what are you crazy? Are you making this up? That would be a normal reaction, but that's not what the defendant does.
>
> The day after he, [W.B.] goes to the police on November 23[], 2016, the defendant books a one-way flight to Brazil and then cancelled it. <u>This evidence is not being offered to say to you that the defendant somehow fled the country and all these other things. What it shows to you is that this was his immediate reaction. It shows you that he knew exactly what was going on in that consensual because this was his first reaction.</u>

33

[(Emphasis added).]

The assistant prosecutor continued this tack, telling the jury defendant did not go to his sister's house for Thanksgiving, and, instead, went to Alabama to "distanc[e] himself" from W.B. "because it's not a secret what happened between the two of them." She also quoted W.B.'s text and defendant's reply, and told the jury:

> Why would he be making her life hell at that point, he's just a bad parent; right? Of course not. And he was making her life hell. He sexually abused her for years and now he's told her that her mother knew about it. Why is [W.B.] saying to him what are you running? Because during this whole course of time, . . . defendant is not in New Jersey the whole time. He's in New Jersey, then he's going out of state. His own sister reported him missing for not showing up to work because he's getting himself away from the situation.
>
> On February 14[], . . . defendant contacts [K.B.] from a restricted phone number, and in this conversation he tells her, oh, you knew. Doesn't tell her, hey, I didn't do this. He takes the blame and now tries to place it on her. But if he didn't do it, wouldn't the normal reaction be what is going on, why is she saying this, what is happening. That's what you would say if you didn't do it.
>
> Ultimately . . . defendant is placed under arrest in Alabama at his cousin['s] . . . house. Her testimony is that after December 23[] the police didn't have any more contact with . . . defendant in New Jersey. We know throughout the course of this, he's basically

34

traveling to different states and at times appearing at this cousin's house in Alabama. We know that he is evasive from restricted numbers, and we talked about this before because he's trying to distance himself from [W.B.]. He's also attempting to relocate.

The detective's hearsay testimony about defendant's travel outside New Jersey was used to prove the truth of the matter. Although not couched in terms of flight, the hearsay testimony about defendant's travel was used by the State as evidence of defendant's consciousness of guilt and his knowledge that W.B. was speaking about his sexual crimes during their recorded conversation; it was his "immediate response." The hearsay testimony was offered to prove the facts upon which that State-drawn inference was based.

We further observe that even if the out-of-state travel evidence was not offered for its truth—which we do not believe to be the case—the trial court did not instruct the jury about its limited purpose. That is not to say we agree with defendant that the trial court erred by failing to include a flight charge; defendant objected to that charge, and under the invited error doctrine

> a "defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." State v. Pontery, 19 N.J. 457, 471 (1955). Thus, when a defendant asks the court to take his proffered approach and the court does so, [the Court

35

has] held that relief will not be forthcoming on a claim of error by that defendant. On another occasion, [the Court] characterized invited error as error that defense counsel has "induced." State v. Corsaro, 107 N.J. 339, 346 (1987).

[State v. Jenkins, 178 N.J. 347, 358 (2004).]

But the trial court should have instructed the jury if the evidence was admitted for a purpose other than its plain truth.

We also discern that W.B.'s statement that she was "not surprised [defendant] ran again," was not analyzed for admissibility. In light of our determination that the detective's testimony about defendant's travel was inadmissible as presented, W.B.'s statement was unsupported by other competent evidence. As used by the assistant prosecutor in her summation, it was used for the truth of the statement. During a N.J.R.E. 104(c) hearing—which was not conducted as to the text messages—the trial court, in addition to determining if defendant's statements were admissible, should have determined if there was a basis for admission of W.B.'s statements, especially the portion which we highlighted. We are dubious that defendant's reply that he was sorry for making W.B.'s "life hell" necessitated the inclusion of her "surprised you ran" statement. Under N.J.R.E. 106, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the

introduction at that time of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously." The doctrine of completeness "allows the reading of a second writing or statement where 'it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.'" Alves v. Rosenberg, 400 N.J. Super. 553, 562 (App. Div. 2008) (quoting State v. Lozada, 257 N.J. Super. 260, 272 (App. Div. 1992)).

The trial court abused its discretion in admitting the hearsay evidence. That evidence supported the State's position that defendant knew what W.B. was discussing during the recorded conversation. That drawn inference was strengthened by the admission of the hearsay testimony about defendant's travel. Further, the State highlighted the hearsay testimony about defendant's purchase of a one-way ticket to Brazil after the recorded conversation.

Of course, we review the admission of the travel-related evidence, to which defendant objected under the harmful error standard whereby a new trial must be granted if the erroneous admission raises a "reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits[.]" Macon, 57 N.J. at 338. We review the admission of the detective's testimony about the ticket to Brazil for plain error. "Under that standard, we disregard an error

unless it is 'clearly capable of producing an unjust result.'" State v. Daniels, 182 N.J. 80, 95 (2004) (quoting R. 2:10-2). "In other words, the error must be 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.'" Ibid. (alteration in original) (quoting Macon, 57 N.J. at 336).

Through that bifocal lens we see that the errors do not warrant a new trial. There was strong evidence of defendant's guilt other than the admitted hearsay. His reaction to K.B.'s request for health insurance information for their daughter's therapy was telling. K.B. testified defendant was nervous, scared, and very childlike. He informed K.B. about passwords and bank account information, "because as soon as [W.B.] spoke to a therapist they were going to have to call the cops and he couldn't live in jail."

The jury also heard defendant's reaction to W.B.'s accusatory inquiries during the recorded conversation in which she referenced "what [he] did" for six-years and her need for therapy "not to get [him] in trouble," but to "actually have closure on what happened because [they] both know what happened wasn't okay." Those admissible references were sufficient evidence for the jury to find that defendant knew W.B. was talking about defendant's sexual assaults. The jury also considered, for its limited purpose, the fresh-complaint evidence. And,

W.B.'s detailed testimony about the sordid acts defendant compelled her to perform was powerful evidence.

The errors were also buffered during the trial. The assistant prosecutor explicitly told the jury that the State was limiting evidence that defendant purchased the one-way ticket to Brazil to show his reaction to his recorded conversation with W.B., not that he fled. Although the trial court failed to conduct a N.J.R.E. 104(c) hearing regarding the text messages between defendant and W.B., there is not a scintilla of evidence that defendant's texts were not voluntary. Furthermore, the trial court included the text messages in its final instruction to the jury regarding defendant's statements.

We also observe that defense counsel ably cross-examined the detective to ameliorate the impact of the hearsay evidence. Counsel elicited that: the detective could not say if the days defendant was absent from work were vacation days; defendant was staying at his cousin's residence in Alabama, and the detective did not know if defendant was on vacation; the credit cards and debit card defendant used as he travelled were in his name, and he did not use a false credit card; the detective did not know if defendant ever attempted to hide his identity as he travelled; and during his travel, an arrest warrant had not been issued for defendant.

39

We countenance neither prosecutorial shortcuts in presenting evidence nor judicial approval of that practice which sullied this trial. "'[A] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials." State v. Biddle, 150 N.J. Super. 180, 183 (App. Div. 1977) (alteration in original) (quoting Brown v. United States, 411 U.S. 223, 231-32 (1973)). We are convinced defendant received just that, notwithstanding these errors.

### III.

Reviewing defendant's argument that the assistant prosecutor improperly vouched for W.B.'s credibility during summation for plain error because no objection was made, Daniels, 182 N.J. at 95 ("Under that standard, [this court] disregard[s] an error unless it is 'clearly capable of producing an unjust result.'" (quoting R. 2:10-2)), we determine it to be without sufficient merit to warrant discussion, R. 2:11-3(e)(2). We add only that the assistant prosecutor responded to defendant's closing argument, during which he repeatedly asserted W.B. fabricated the allegations, by rhetorically querying what would be her motivation for so doing. The assistant prosecutor did not vouch for W.B. She properly pointed to record evidence and inferences related thereto. See State v. Frost, 158 N.J. 76, 82 (1999). It is well-settled that the State "may argue that a witness is credible, so long as the prosecutor does not personally vouch for the

40

witness or refer to matters outside the record as support for the witness's credibility." State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004). While prosecutors are typically barred from arguing that a witness had no motive to lie, see R.B., 183 N.J. at 331-32, the assistant prosecutor's remarks were an appropriate counter to the attacks on W.B.'s credibility made during defendant's summation, a practice we have held as permissible, See e.g., State v. Murray, 338 N.J. Super. 80, 88 (App. Div. 2001) (finding that a "prosecutor's statement to the jury that [the witness] had no motive to lie was a carefully measured and appropriate response to defendant's attack on [the witness's] credibility").

## IV.

Defendant was sentenced to an aggregate nineteen-year prison term subject to an eighty five percent parole disqualifier pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[8] The trial court found aggravating factors two, three, and nine, N.J.S.A. 2C:44-1(a)(2), (3) and (9), assigning "maximum weight" to factors two, "[t]he gravity and seriousness of harm inflicted on the victim," N.J.S.A. 2C:44-1(a)(2); and nine, the need for

---

[8] The aggregate sentence was the term imposed on count one. The trial court imposed concurrent sentences of: five years on count three; ten years subject to NERA on count four; five years on count six; ten years subject to NERA on count seven; and five years on count nine. The court merged: count two into count one; count five into count four; and count eight into count seven.

A-5090-17T4

deterrence, N.J.S.A. 2C:44-1(a)(9); and "significant weight" to factor three, "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3). He concluded the aggravating factors outweighed mitigating factor seven, "defendant has no history of prior delinquency or criminal activity[,]" N.J.S.A. 2C:44-1(b)(7), to which he assigned "appropriate significant weight[.]"

We are largely unpersuaded by defendant's arguments that the trial court "failed to articulate and evaluate" the evidence in finding and weighing aggravating factors two, three, and nine, N.J.S.A. 2C:44-1(a)(2), (3) and (9), and engaged in impermissible double-counting.

Our review of a sentence is narrow. State v. Miller, 205 N.J. 109, 127 (2011). Our duty is to assure that the aggravating and mitigating factors found by the judge are supported by "competent credible evidence in the record." Ibid. (quoting State v. Bieniek, 200 N.J. 601, 608 (2010)). As directed by the Court, we must (1) "require that an exercise of discretion be based upon findings of fact that are grounded in competent, reasonably credible evidence"; (2) "require that the factfinder apply correct legal principles in exercising its discretion"; and (3) modify sentences only "when the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience." State v. Roth, 95 N.J. 334, 363-64 (1984). Applying a deferential standard of review to the

A-5090-17T4

judge's sentencing determination, we find no error in the judge's identification and balance of the "aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 594, 606 (2013)).

The trial court found: aggravating factor two applicable "because the victim of the offense was particularly vulnerable or incapable of resistance because of the extreme youth that we are dealing with in this case"; aggravating factor three because of the continuous nature of defendant's assaults; and aggravating factor nine.

Rule 3:21-4(g) requires the trial court to point to specific facts supporting its determination that aggravating or mitigating factors exist. The "explanation is important for meaningful appellate review of any criminal sentence challenged for excessiveness" because it allows this court to "assess the aggravating and mitigating factors to determine whether they 'were based upon competent credible evidence in the record.'" Bieniek, 200 N.J. at 608 (quoting Roth, 95 N.J. at 364). A sentence will not be remanded, however, simply because the sentencing court's statement of reasons for finding the aggravating or mitigating factors could have been clearer. See id. at 609. Rather, the sentence will still be upheld so long as it is "possible in the context of [the]

record to extrapolate without great difficulty the [sentencing] court's reasoning." State v. Pillot, 115 N.J. 558, 566 (1989). This occurs "when the record is clear enough to avoid doubt as to the facts and principles the court considered and how it meant to apply them." Miller, 205 N.J. at 130.

Although the trial court's reasons for finding aggravating factor two were brief, it is clear from the record that the court—which presided over the trial—was aware of and considered that the victim was six years-old when the assaults commenced, and that defendant, as her father, was in a position of authority which he freely exercised during overnight parenting time. We observe the victim's mother reminded the court of this fact at sentencing. The assistant prosecutor highlighted that point stating: "Your Honor is well aware in this case that what was happening to this little girl began happening when she was approximately six years[-]old, and the defendant in this case utilized the relationship with his own daughter to continually engage in this type of conduct." Thus, the trial court focused "particular attention to any factors that rendered the victim vulnerable or incapable of resistance at the time of the crime," Lawless, 214 N.J. at 611, "engag[ing] in a pragmatic assessment of the totality of harm inflicted by the offender on the victim," State v. Kromphold, 162 N.J. 345, 358 (2000), and giving weight to "the victim's particular

vulnerability to the perpetrator[,]" State v. A.T.C., 454 N.J. Super. 235, 256 (App. Div. 2018), rev'd on other grounds, 239 N.J. 450 (2019).

We also disagree with defendant's argument that the trial court engaged in impermissible double-counting, which occurs when the "established elements of a crime for which a defendant is being sentenced . . . [are] considered as aggravating circumstances in determining that sentence," Kromphold, 162 N.J. at 354, with regard to aggravating factor two. Both sexual crimes required only that the victim be under age thirteen, see N.J.S.A. 2C:14-2(a)(1); N.J.S.A. 2C:14-2(b); the endangering charge required the victim to be under age eighteen, N.J.S.A. 2C:24-4(b)(1). A finding of aggravating factor two can be based on the victim's "extreme youth," N.J.S.A. 2C:44-1(a)(2). The trial court's finding based on assaults that began when W.B. was six years-old was not double-counting because it "consider[ed] facts showing defendant did more than the minimum the State is required to prove to establish the elements of an offense." A.T.C., 454 N.J. Super. 254-55; see also Taylor, 226 N.J. Super. at 453. Defendant's paternal relationship could also be considered in finding aggravating factor two as to the sexual offenses because it is not an element of those crimes.

Defendant's argument that the trial court improperly determined aggravating factor three applied is also unpersuasive. Defendant buttresses his argument with the Static-99R actuarial risk scores set forth in the Adult Diagnostic and Treatment Center report (Avenel report) prepared in connection with his eligibility for sentencing under the Sex Offender Act, N.J.S.A. 2C:47-1 to -7. According to the Avenel report, defendant's score on the Static-99, a recognized "actuarial test used to estimate the probability of sexually violent recidivism[,]" In re Civil Commitment of R.F., 217 N.J. 152, 164 n.9 (2014), fell "within the 'Below Average Risk' category for being charged with or convicted of a new sexual[]offense after five years in the community."

N.J.S.A. 2C:44-1(a)(3) provides that a trial court must consider "[t]he risk that the defendant will commit another offense" when making its sentencing determination. "A court's findings assessing . . . the predictive assessment of chances of recidivism . . . involve determinations that go beyond the simple finding of a criminal history and include an evaluation and judgment about the individual in light of his or her history." State v. Thomas, 188 N.J. 137, 153 (2006). Although a trial court is obliged to consider all factors when determining whether a defendant runs a risk of reoffending, it is not required to give one such factor controlling weight over the others. See id. at 153-54.

The trial court discounted the Static-99 in rejecting mitigating factor nine, N.J.S.A. 2C:44-1(b)(9):

> I do consider the Avenel report which in all of its reports now gives a -- kind of a test that they apply. It's an overall test. They do put the caveat in that it doesn't specifically mean that this defendant that's facing sentenc[ing] will in any way fit within those boundaries of those test results.

Instead, the trial court determined that defendant ran a high risk of reoffending due to the continuous nature of the sexual assaults in this case.

The trial court did not abuse its broad discretion by rejecting the Avenel Report. The court noted Static-99's limitations—"the caveat"—set forth in the Avenel report: it "is an actuarial tool with moderate accuracy"; the "rate, confidence interval and nominal category apply to the group and not to [defendant]"; "[t]he degree to which the routine sample is congruent with characteristics of New Jersey offenders is unclear"; and "[i]t is important to note that the Static-99R risk for recidivism . . . may be higher or lower than that indicated by the Static-99 based on factors not included in this risk tool." The trial court's reliance on the nature and extent of the trial evidence—what the Avenel report termed defendant's "repetitive" criminal sexual behavior over six years—amply supported its aggravating factor three finding. See Thomas, 188 N.J. at 153 (noting that a factor three assessment does not rise and fall on one

47

factor, but rather, "include[s] an evaluation and judgment about the individual in light of his or her history").  The trial court's individualized assessment of defendant's risk to commit another offense will not be disturbed.

Defendant contends that "the [trial court's] reasons for applying aggravating factor nine [were] insufficiently explained and . . . not supported by the record."  Because, in finding aggravating factor nine, the trial court simply stated there was a "need to deter this defendant specifically and others from violating the law" we are constrained to remand this matter because the court did not provide the required factual explanation for its finding as mandated by Rule 3:21-4(g).

A factor nine determination requires not only a "'qualitative assessment' of the risk of recidivism, but 'also involve[s] determinations that go beyond the simple finding of a criminal history and include an evaluation and judgment about the individual in light of his or her history.'"  State v. Fuentes, 217 N.J. 57, 78 (2014) (alteration in original) (quoting Thomas, 188 N.J. at 153).  The trial court was obligated to point to specific facts supporting its conclusion that there was a need to deter both defendant and the general public from engaging in future criminal behavior.  See id. at 78-79.

We do not imply that reasons for general and specific deterrence of a father's sexual abuse of his child over six years do not exist. We remand only for the court to set forth its reasons. During resentencing the court must also explain its reasons for the weight it assigns to each aggravating and mitigating factor. See State v. Case, 220 N.J. 49, 68 (2014) (vacating and remanding a sentence because the trial court "did not adequately explain its decision to give [an aggravating] factor 'particular emphasis'"); Fuentes, 217 N.J. at 81 (vacating defendant's sentence in part because the trial court needed to "explain in greater detail its assessment of the weight assigned to each aggravating and mitigating factor, and its balancing of those statutory factors as they apply to defendant").

In light of our remand, we need not address defendant's contention that the trial court improperly determined that the aggravating factors outweighed the mitigating factors. We trust the trial court will fully assess and weigh the applicable factors. We leave the ultimate sentence imposed to the trial court; we do not suggest the sentence imposed shocked the judicial conscience.

Affirmed; remanded for resentencing in conformance with this decision. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5090-17T4