132 N.J. Super. 412 (1975)
334 A.2d 52
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN HUMMEL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1975.
Decided January 29, 1975.
*417 Before Judges CARTON, CRANE and KOLE.
Mr. Norman L. Zlotnick argued the cause for appellant (Mr. Marvin D. Perskie for Messrs. Perskie and Callinan, attorney; Mr. George Brown Neidig on the brief).
Mr. Howard E. Drucks, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
*418 The opinion of the court was delivered by KOLE, J.A.D.
Defendant appeals from his convictions for contributing to the delinquency of two minor girls (N.J.S.A. 2A:96-4), for their carnal abuse (N.J.S.A. 2A:138-1 and for impairing their morals (N.J.S.A. 2A:96-3). The girls, R and D, are both under the age of 16.
Defendant was sentenced to State Prison for concurrent terms of 5 to 7 1/2 years on each carnal abuse charge; 1 to 3 years on each morals impairment charge, and a term of 1 to 3 years on each contributing to delinquency offense, concurrent with each other but consecutive to one of the carnal abuse 5 to 7 1/2-year-terms. Thus, his aggregate sentence was for a period of 6 to 10 1/2 years.
During a period of slightly more than three years R and D were foster children in the home of defendant and his wife. They were about 12 years old when they arrived and about 15 years of age when they left. R's younger sister C, who was about seven years old when she entered, was also a foster child in the home.
According to R, within two weeks of her arrival she acceded to defendant's request to enter his bedroom to scratch his back. While there, there was mutual touching of private parts and then intercourse. Thereafter on other occasions there were also acts of intercourse and touching by mouth of each other's sex organs. She discussed these events with D, who told her that defendant liked to have intercourse with her and she "had to play with him and he played with her." R had seen her sister C in defendant's bedroom more than ten times.
R reported that she had never complained to either Mrs. Hummel or to Linda Portwood, her caseworker, of these events while living in the Hummel home. She said that she was afraid to complain because defendant had said that she would be put away in a children's shelter if she told. After leaving the Hummel house R was placed in the home of her sister L. When she had been there about one month she advised her sister as to Mr. Hummel's acts. L. testified *419 that R had informed her that defendant had frequent sexual relations with the three girls over a period of three years.
D testified that several months after she had entered the Hummel home as a foster child she had accompanied R into defendant's bedroom to scratch his back and that defendant "would mess" and touch her privates. Some time later, a week or a month, D was again in defendant's bedroom scratching his back, when he threw her on the bed and made her have intercourse with him. On another occasion she was asleep on the couch in the living room and awoke to discover that defendant had his head between her legs. She pulled his hair and hit him until he got away. D said that she had intercourse with defendant two or three times and that he had, on occasion, offered her $1 if he could make love to me or "something."
D also stated that R had told her on several occasions about her activities with defendant and that the two of them had discussed these events. She also testified that before she left the Hummel house the youngest foster child, C, informed her that defendant had played with her. D stated that she had not complained to the caseworker or to anyone else about defendant's conduct because he had said that she would be put away if she told. She first imparted this information to her aunt after leaving the Hummel home to reside with her.
C testified that defendant called her into his bedroom to scratch his back and comb his hair and that he would ask her to "pull down my pants once in awhile." She testified that "he put his finger in my rear end" more than once. C reported that on one occasion defendant's wife entered the bedroom while she had her pants down and yelled at her and sent her to her room. On this occasion she and R told each other what defendant had been doing to them. R and D told C not to scratch defendant's back again and she did not do so thereafter. C said that she had not told the police about these events when questioned because she was afraid that defendant would put her away.
*420 Linda Portwood, a caseworker for the New Jersey Division of Youth and Family Services, assigned to the foster children in the Hummel house, reported that she had received a telephone call from L some two or three weeks after R had moved into her home. Upon visiting L's house she spoke to R, who told her of defendant's conduct toward her. She also testified to a subsequent conversation with D, who verified R's story. As a result of these interviews Miss Portwood confronted defendant, who denied the charges. She arranged to transfer the remaining foster children from the Hummel house and notified the county prosecutor.
Defendant testified. He denied the charges. He stated that he was not close to the foster children and that he believed they resented the fact that he paid more attention to his own daughters.
The foster children, he said, created problems. R had great difficulty with school work and his wife had resisted efforts to place the girl in a school for retarded children. He described R as very temperamental and as suffering nightmares. He said that R disliked him and his family because they were strict, and that D had been arrested for stealing at a local shopping center.
He conceded that the foster children did scratch his back while watching television. He said that they had only entered his bedroom once or twice to scratch his back and that, although he was not fully dressed, he was fully covered by the bedclothes, the door was left open and his wife was in the next room. He also stated that he had given R money to scratch his back but did so "very seldom." He further stated that he had been sexually impotent for a number of years and had not had relations with anyone, including his wife. Defendant and each of the foster children were in agreement that defendant's wife slept in the living room on a couch.
A psychiatrist called by defendant gave evidence based on an interview and examination of defendant. He reported that defendant, as a young man, had been able to function *421 sexually only with the assistance of alcohol and that he had lost even this ability in his forties. The doctor concluded that defendant suffered from lifelong feelings of insecurity and anxiety; that he suffered from impotence and that there was no evidence of sexual perversion. He stated, however, that there was no reliable physical test to establish the existence of impotence and that it was necessary to rely in large measure on the statement of the patient in reaching his conclusions.
Two character witnesses testified as to defendant's good reputation.
We have reviewed each of the errors alleged by defendant and have concluded that they are without merit. Hence, considered alone or in the aggregate, they do not warrant reversal of the convictions.
The first claimed error is the trial judge's permitting various witnesses to testify as to conversations with R and D, the objects of the sexual misconduct for which defendant was convicted, relating to such misconduct. It is urged that the fresh complaint rule does not apply to R's testimony concerning the statements made to her by D, D's testimony as to R's statements to her, or L's testimony as to what R told her in this respect. These statements were hearsay and were admissible only under the fresh complaint doctrine. We note that the court discouraged the recounting by witnesses of the details of the statements involved.
It is contended that R should not have been permitted to testify as to D's statement to her before D had testified and an attack been made on D's credibility.
Defendant first argues that such evidence is admissible under the fresh complaint rule only in response to efforts by defendant to impeach a complaining witness. We do not agree.
In State v. Balles, 47 N.J. 331, 338 (1966), cert. den. and app. dism. 388 U.S. 461, 87 S.Ct. 2120, 18 L.Ed.2d 132 (1967), the court discussed the fresh complaint rule:
*422 The rule is applied widely in rape and morals cases and permits proof that the violated victim complained within a reasonable time to someone she would ordinarily turn to for sympathy, protection and advice.
In Balles the court gave the rationale for the rule, saying:
* * * if no testimony were offered with respect to the complaint the jury might naturally assume that none was made and * * * it is only just that the prosecution be permitted to forestall this natural assumption by showing that a complaint was in fact made. [at 338; emphasis supplied]
Thus, the State need not wait, as defendant contends, until defendant has brought the assumption of contradiction into the open by explicitly raising the question. The prosecutor may anticipate that assumption in the minds of the jurors and introduce the fact of the complaint and the nature thereof before any actual impeachment occurs. See also, State v. Tirone, 64 N.J. 222 (1974); State v. Gambutti, 36 N.J. Super. 219, 226 (App. Div. 1955).
The statement in State v. Orlando, 119 N.J.L. 175, 180 (Sup. Ct. 1937), relied on by defendant is inapposite. There the complaining witness had already been impeached. The court was concerned not with the kind of pre-impeachment testimony here involved, as to the nature of the complaint, but rather with the admissibility of the details of the complaint to rehabilitate the credibility of the witness.
Defendant also claims that R's testimony as to D's statements to her should not have been admitted because the complaining witness, D, had not yet testified. This, too, is without substance. Balles, supra, rejects any notion that such testimony may only be admitted after the complaining witness has testified. 47 N.J. at 340. The court there noted that the only significant question is whether, in fact, the complaining witness does give testimony at trial. Here both R and D testified. As Balles said (at 340-341), "in any event `the defendant cannot regulate the state in its order of proof.'"
*423 Defendant argues that the statements of R and D referred to in the testimony of other witnesses occurred too late in time to qualify as fresh complaints. In R's case the statements were made some three years after the events complained of began, and four to six weeks after she left the Hummel house. This argument is also without merit.
As already noted, the fresh complaint rule permits "proof that the violated victim complained within a reasonable time to someone she would ordinarily turn to for sympathy, protection and advice." State v. Balles, supra at 338.
In determining what constitutes a reasonable time in this case it is important to recognize that both R and D were foster children under the control of defendant and his wife. Additionally, the jury obviously believed their testimony that defendant had threatened them with being put away in a children's shelter if they spoke. Under these circumstances their continued silence, except with respect to statements to each other, while resident in the Hummel home is not unreasonable. Nor is a delay of four to six weeks before R informed her sister L of what had happened unreasonable. We cannot conclude, under evidence which the jury could find credible, that a 15-year-old girl, abused and threatened for some three years, would not reasonably require several weeks to overcome her residual fears. "[The] nearness of the complaint to the occurrence or the remoteness therefrom cannot affect its competency, but only its probative value." State v. Schaeffer, 87 N.J.L. 663, 667 (E. & A. 1915). See also State v. Balles, supra, 47 N.J. at 341; Wigmore, Evidence (Chad. rev. 1972), § 1135, at 301-303.
We are satisfied that under the circumstances of this case all of the statements of the complaining witnesses, including those to each other, were made within a reasonable time after the events, and thus were competent. We also conclude that the information imparted by each of the girls to the other  D and R  constituted complaints within the fresh complaint rule.
*424 Defendant contends that the trial court erred in failing to instruct the jury at the time the fresh complaint testimony was admitted as to the limited purpose for which it was received. There is no such time requirement under Evid. R. 6. In its instructions to the jury at the end of the case the court adequately charged with respect to the limited nature of this testimony. In any event, there is no basis for assuming that any delay in giving this instruction tended to prejudice the jury against defendant. The fresh complaint testimony was clearly identified as hearsay, the source and circumstances of each statement being specified in the testimony of each witness. The victims themselves testified as to the events recounted in the hearsay statements. Under these circumstances we cannot conclude that, even prior to the instruction, the jury thought that the other witnesses had independent knowledge of the events complained of.
Defendant's reliance on State v. Tirone, supra, is misplaced. The court there held that it was not plain error for the trial court to fail to give any instruction at all on the limited purposes for which fresh complaint evidence was admitted. Here the potential for prejudice is far less since a proper instruction was given.
Defendant asserts that the judge erred in allowing D to testify about a conversation she had with C. C, R's younger sister, was not a complaining witness and the indictments here in no way referred to any acts by defendant involving her. D testified that C had told her that defendant had made her "play with him." The judge did not admit this hearsay statement of C under the fresh complaint rule, because C was not a victim of any of the offenses being tried. Rather, it was admitted under Evid. R. 55 concerning evidence of other crimes.
We have concluded that D's testimony of what C told her was inadmissible either under the fresh complaint doctrine or under Evid. R. 55. It is not a complaint under that doctrine, irrespective of whether C was a complaining *425 witness; for C's testimony on the stand did not involve a claim that defendant made her "play with him." It was thus inadmissible hearsay. Evid. R. 55 may not be utilized to admit hearsay otherwise incompetent as evidence. However, since C herself testified, we have concluded that the admission of D's testimony as to the single conversation with C was harmless error.
Defendant objected to C's testimony at the trial. We shall therefore consider whether that evidence was properly permitted under Evid. R. 55.
Other crime evidence may be admitted under that rule if the evidence is designed "to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident." It is not necessary that there be a conviction for the proof of the other crime to be admitted. See State v. Seefeldt, 51 N.J. 472 (1968); State v. Mulero, 51 N.J. 224 (1968). Moreover, the specific instances mentioned in the rule where such proof may be allowed is "only illustrative. It is not meant to include all situations when the other crime evidence may be advanced as proof of a fact in issue." Report of the State Rules of Court Review Commission (1972 ed., Annotations), at 214, 220 (hereafter Report).
The testimony of C, a foster home ward in defendant's home during the same period that D and R were there, was admissible to show defendant's state of mind and attitude as to sexual behavior with his wards. The criminal acts testified to by C were so related to the crimes charged against defendant as to time, place and circumstance as to evidence a continuous state of mind with respect to the acts for which he was being tried. See State v. Sinnott, 24 N.J. 408, 413-414 (1957). The fact that C was not mentioned as a victim in any indictment against defendant for the acts testified to is of no moment.
C's testimony did not bear on defendant's general predisposition towards sexual misconduct with young girls *426 or the kind of wrongdoing with which he was charged. Rather, the circumstances here were so circumscribed, involving the treatment of foster children in defendant's home while they resided there, that the other crime evidence given by C and real legal relevance to the issue of his sexual attitude and conduct towards such foster children. It is so intertwined in time, place and circumstance with the charges here involved as to be admissible under Evid. R. 55. See State v. Smith, 84 N.J. Super. 452 (App. Div. 1964); State v. Hinterberger, 41 N.J. Super. 597, 605 (App. Div. 1956), certif. den. 23 N.J. 57 (1956); State v. Kuske, 109 N.J. Super. 575 (App. Div. 1970), certif. den. 56 N.J. 246 (1970); McCormick, Handbook of the Law of Evidence (1972), § 190, at 448-450. See also State v. Mulero, supra.[1] The independent relevance of this testimony to the case was such that it cannot be said to have been substantially outweighed by the risk of prejudice to defendant. See State v. Slocum, 130 N.J. Super. 358 (App. Div. 1974).
Defendant argues that under Evid. R. 6 the judge should have instructed the jury as to the limited purpose for which C's testimony was being admitted. This is correct. Report, supra, at 223. Apart from C's testimony there was ample evidence of defendant's guilt to which the jury, as it did, could give credence. Under these circumstances the failure to give the instruction had no such real possibility for prejudice as to warrant a conclusion that, by reason thereof, the jury arrived at the wrong result. State v. Tirone, supra; State v. Macon, 57 N.J. 325 (1971); State v. Di Paglia, 64 N.J. 288 (1974). Compare State v. Bankston, 63 N.J. 263 (1973).
*427 Defendant contends that he was deprived of his constitutional right of confrontation and effective cross-examination by the court's limitation of his attempts to impeach the credibility of R and D. We disagree.
We assume, for the purpose of determining the issue thus raised, that the contents of the caseworker's social records as to these girls might be admissible as business records or otherwise and that their confidentiality would not have barred such admissibility.
The judge refused to allow defendant, through cross-examination or the social records of the girls, to show a prior fabrication as to what defendant refers to as a "serious matter," previous instances of misconduct and disorderly behavior on their part, their instability of character and their being problem children in other foster homes. The development of this evidence, in conjunction with proof that defendant treated them strictly and required discipline, according to defendant, would have demonstrated motives of resentment from which an inference could be drawn that the girls were lying. The court also did not permit evidence that D had accused her uncle of an indecent obscene gesture, an accusation deemed to be somewhat similar to that in the present case.
Such methods of impeachment are precluded by Evid. R. 22, which provides in part:
As affecting the credibility of a witness * * *
(c) evidence of traits of his character other than honesty or veracity or their opposites, shall be inadmissible;
(d) evidence of specific instances of his conduct, relevant only as tending to prove a trait of his character, shall be inadmissible.
Thus, defendant's approach was improper both in the character traits it sought to establish and in the use of specific instances of conduct to establish these traits. Additionally, such evidence of D's accusatory trait was not admissible. See State v. Mondrosch, 108 N.J. Super. 1, 4 (App. Div. 1969), certif. den. 55 N.J. 600 (1970).
*428 The evidence sought to be adduced in no respect would show bias against this defendant or a motive to fabricate with respect to the charges against him. The bad experiences of the girls in their prior foster homes or their developing a hatred thereby for any foster parent were not relevant to or probative of a prejudice against defendant or of a motive to charge defendant with these sexual offenses. The situation here is thus substantially different from that in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Douglas v. Alabama, 380 U.S. 415, 58 S.Ct. 1074, 13 L.Ed.2d 934 (1965) or United States v. Harris, 501 F.2d 1 (9 Cir.1974), relied on by defendant.
The judge did not abuse his discretion in refusing to permit the line of inquiry sought by defendant, nor was defendant denied a fair trial or the right of confrontation by reason of such refusal. See State v. Petillo, 61 N.J. 165 (1972), cert. den. 410 U.S. 945, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973); State v. Pontery, 19 N.J. 457, 473 (1955); State v. Tirone, supra, 64 N.J. at 228; State v. Arbus, 54 N.J. Super. 76 (App. Div. 1959). Compare State v. Steele, 92 N.J. Super. 498 (App. Div. 1966).
The judge properly instructed the jury during his charge as to the State's burden of proof and the definition of reasonable doubt. About one hour after retiring for deliberation the jury requested a copy of the instructions in this respect. The judge advised the jury that it could not have a copy but instead gave a supplemental instruction as to reasonable doubt. Defendant claims that the contents of the supplemental charge and its timing were such as to confuse the jury with respect to the State's burden of proof and thus tainted the verdict. We have examined both the charge and the supplement and are satisfied that there is no merit to this claim. The judge was not required, as defendant contends, merely to repeat or have the court reporter repeat the part of its original charge dealing with the *429 matter. See State v. Wilbely, 63 N.J. 420, 422 (1973); State v. Terry, 89 N.J. Super. 445 (App. Div. 1965).
We conclude that defendant had a fair trial in all respects. The judgments of convictions accordingly are affirmed.
NOTES
[1] In view of the special facts here involved, we need not comment on the query posed in the Report, supra at 221, as to whether "readily" allowing other crime evidence in certain types of sexual offense cases is still a viable exception to the exclusionary principle of Evid. R. 55.