# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2144-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FRANK L. NATANNI,

    Defendant-Appellant.

_____

> Submitted March 9, 2026 – Decided June 8, 2026
>
> Before Judges Sabatino and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 22-10-0679.
>
> Mark W. Catanzaro, attorney for appellant.
>
> Andrew B. Johns, Gloucester County Prosecutor, attorney for respondent (Michael C. Mellon, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Frank L. Natanni appeals from a March 7, 2025 judgment of conviction entered after a jury found him guilty of second-degree sexual assault of a minor under the age of thirteen, N.J.S.A. 2C:14-2(b); second-degree endangering sexual conduct with a child by a caretaker, N.J.S.A. 2C:24-4(a)(1) and third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a). The court sentenced defendant to an aggregate six-year custodial term, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Before us, defendant raises the following arguments in which he challenges only his convictions:

> POINT I
>
> THE STATE SHOULD HAVE BEEN PRECLUDED FROM INTRODUCING TESTIMONY AS "FRESH COMPLAINT."
>
> POINT II
>
> THE TRIAL COURT ERRED WHEN IT PRECLUDED THE DEFENDANT FROM UTILIZING THE TRANSCRIPTS OF [J.T.]'S STATEMENTS TO THE PROSECUTOR'S OFFICE.
>
> POINT III
>
> THE COURT ERRED WHEN IT DENIED DEFENDANT'S REQUEST FOR A JUDGMENT OF ACQUITTAL WITH REGARD TO THE [ENDANGERING COUNT] OF THE INDICTMENT.

2

POINT IV

THE COURT ERRED IN DECLINING TO GIVE AN INSTRUCTION REQUIRING UNANIMITY WITH REGARD TO THE ENDANGERING CHARGE AND PROVIDING SPECIAL INTERROGATORIES TO THE JURY.

POINT V

THERE WAS INSUFFICIENT EVIDENCE PRESENTED TO CONVICT [DEFENDANT] OF COUNT [ONE] OF THE INDICTMENT CHARGING SEXUAL ASSAULT.

We have considered all of defendant's arguments against the record and the applicable legal principles and conclude they are without merit. We accordingly affirm all of the convictions.

I.

In an October 2022 superseding indictment, the State alleged defendant sexually touched and assaulted J.T.,[1] a child of a neighbor who babysat his children and who he also coached in basketball. The State alleged defendant's physical abuse began in October 2019 when she was twelve years old, during which defendant also communicated explicitly with her via Snapchat, an instant message application.

---

[1] In order to protect the privacy of the child victim we use initials when referring to her. R. 1:38-3(c)(9).

A-2144-24

The events prompting the indictment began in March 2020, following an incident that raised J.T.'s parents' suspicions surrounding the nature of the relationship between defendant and J.T. After her parents contacted their local police department, the resulting investigation uncovered inappropriate and suggestive Snapchat messages between J.T. and defendant and also included a "forensic interview" with an investigating officer where J.T. "did not make any disclosures of sexual abuse." In the March 2020 forensic interview, J.T. denied "anything inappropriate happening between her and . . . defendant" but stated defendant considered J.T. as his "girlfriend" and they did have physical contact including "hug[s] or kiss[es] on the forehead."

As later introduced at trial, the Snapchat messages discovered by her parents and further investigated by the police, which defendant sent to J.T. under the pseudonym "Pete" to avoid suspicion, were replete with inappropriate language and sexual innuendo. Defendant repeatedly expressed his desire to be physically close to J.T., writing, for example, "I want you sooooooo baddddd," and "[o]nly if you don't care that I will be all over you." The messages emphasized defendant's desires to "kiss" and "cuddle" with the victim. Further, defendant described detailed sexual fantasies involving J.T., set in the den and bedroom of his home. These fantasies included descriptions of defendant's

4

desire to rub and fondle her legs and the area "around [her] waistband on [her] pants."

Following the investigation, the State charged defendant with one count of second degree endangering the welfare of a child by a caretaker in a February 10, 2021 indictment, based largely on the explicit nature of the Snapchat messages. During trial preparation, after having spoken to the investigating officer initially in March 2020, J.T. spoke again to a separate investigating officer in August 2022 where she offered more details about the sexual abuse she endured, following her subsequent disclosures about the extent of the abuse to her mother. After the second interview, the State advised the court that new information had come to light, and a new indictment would be sought. On October 13, 2022, in a superseding indictment, the State, as noted, charged defendant with second-degree sexual assault of a minor under the age of thirteen and aggravated criminal sexual contact, in addition to the original one count of endangering sexual conduct with a child by a caretaker.

Fresh Complaint Hearing

In September 2024, the State filed a motion to admit fresh complaint testimony by J.T.'s parents with respect to her subsequent disclosures of sexual abuse. It explained that during trial preparation, J.T. began "drop[ping] hints

5

that something more may have occurred between her and [defendant]." It contended the disclosure "came gradually after meeting with the State" and culminated in July 2022, when J.T. disclosed to her mother that defendant regularly sexually abused defendant. After J.T. "asked to tell her story," the prosecutors scheduled an additional interview in August 2022. The State argued her parents, as "people . . . J.T. felt she could confide," should be permitted to testify in light of her age at the time of the abuse, her age at the time of the disclosure, the "circumstances that led to J.T.'s disclosure, the general nature of the disclosure, and the condition that J.T. was in when the disclosure was made."

Defendant opposed the State's motion and argued J.T.'s disclosures to her parents did not constitute fresh complaints because "they were not made within a reasonable time." He contended there existed no "reasons to permit the extended time frame," such as J.T. being threatened by defendant or residing with him. Included as an exhibit to defendant's opposition was the transcript of J.T.'s initial March 2020 forensic interview and the supplemental report prepared by the investigating officer following the subsequent August 2022 interview. Both were later introduced at trial.

During that August 2022 interview, J.T., who was fifteen years old at the time, detailed the extent of the sexual abuse she experienced and discussed

several instances where she was assaulted.  These instances began in October 2019, when defendant began acting "weird" toward J.T., who was then twelve years old.  She explained defendant began to "touch[] her everywhere and mak[e] it seem like an accident," including an incident around Halloween where he "touched her vagina."  She explained he began hugging her in a way that was different than a hug from a "family member."

Another incident involved J.T. babysitting defendant's children where, after arriving home, defendant "carried her to his bedroom where he locked the door, got on top of her, and started kissing her neck and face."  She explained defendant "would kiss and touch her in the same way in the living room," often making it seem like an accident and apologizing afterward.  She explained these incidents of abuse continued to occur during babysitting and in the car when defendant would take her home from basketball practices.  She also discussed her communications with defendant via Snapchat and explained defendant created the account for her.

On October 29, 2024, after considering the parties' briefs and submissions, the court held an evidentiary hearing pursuant to N.J.R.E. 104, where it heard testimony from J.T.'s parents who described their conversations regarding the sexual abuse with their daughter after the initial March 2020 interview.  First,

her father testified that following March 2020, his daughter "started to share more" about the nature of the abuse she suffered, including details of defendant's "kissing and touching." He testified that her unprompted disclosures, specifically to her mother, led to the second interview with investigators in August 2022.

Further, her mother testified to the several disclosures J.T. made to her, including the disclosure in July 2022, which prompted the follow-up interview. She explained how it took almost two years for J.T. "to be able to give the statement that she wanted to give" because, with time, she had processed her abuse and could "disclose more." Further, J.T.'s mother stated that during her subsequent disclosures, she did not "ask [J.T.] any questions" and preferred her daughter to "have her voice and her moment of expressing how she felt."

Prior to the July 2022 disclosure, J.T.'s mother explained J.T. stated she "hated" defendant on several occasions, dating back to a conversation on vacation in June 2020 where J.T. did not "disclose details" but explained to her mother that "there was more that happened." Following the conversation in June 2020, a "couple of months later," J.T. also disclosed that defendant, while driving her to and from basketball practices, would pull over his car on a specific street in the neighborhood and sexually abuse her. She also testified to the

tumultuous relationship she had with her daughter during this period but explained she thought the change in her daughter's demeanor was accountable to changes in the family's circumstances, specifically her father's decision to leave the family.

After considering the testimony and parties' arguments, the court granted the State's motion to admit J.T.'s parents' testimony under the fresh complaint doctrine. The court noted the doctrine "must be applied flexibly in light of the reluctance of children to report sexual assault." The court found J.T. did not have "sufficient time to process" at the time of the March 2020 incident in light of the "sort of whirlwind that happened after getting the police involved." The court further found J.T. did not immediately report her sexual abuse in part due to the fact that J.T. "appeared to be protective of and [thought she was] in love with [defendant] based upon what was going on."

The court found the potential testimony of both parents to be credible, particularly her mother, who the court noted testified to significantly more details than her father. It further explained it did not "hear anything that would suggest that [J.T.'s] parents engaged in any sort of an interrogation or detailed questioning of the victim." In granting the State's motion, the court also noted

9

J.T. would be subject to cross-examination to all of the statements for which her parents may testify.

After admitting the testimony, the court prepared a limiting instruction, with which the parties agreed they were "comfortable." Before either parent testified, the court read the following limiting instruction to the jury:

> [T]he law recognizes that stereotypes about sexual assault complaints may leave some of you to question [J.T.]'s credibility based solely upon the fact that she did not complain about the alleged abuse sooner. You may or may not conclude that [J.T.]'s testimony is untruthful based only on her silence or delayed disclosure. You may consider the silence or delayed disclosure along with all of the other evidence, including [J.T.]'s explanation for her silence or delayed disclosure when you decide how much weight to afford [J.T.]'s testimony.

Evidentiary Ruling

J.T. also testified during trial. She explained how after moving into the neighborhood in August 2019, she began playing basketball with defendant's niece and joined the team he coached. She testified she was "confused" and "sad" at the time, in light of her father's decision to "move out" of the home, a fact of which defendant was aware and would attempt to "give [her] comfort."

She testified defendant "initially did not do anything" but recalled a shift following an incident where defendant "kept asking [her] what was wrong" and

10

eventually began "hugging . . . and holding [her]" while seated on his couch in his living room. Following the incident, J.T. testified defendant began regularly "pick[ing her] up and hav[ing her] straddle him, and he would hug [her]." She testified defendant's conduct escalated again following an incident while babysitting his children where "he took [her], carried [her] into his room, . . . shut the door," and proceeded to "kiss and cuddle" her. She described defendant's repeated and frequent touching around her upper leg, waist, buttocks, and vaginal area, including the incident around Halloween.

J.T. testified to several other notable incidents, including one at a sleepover and the regular abuse she endured when defendant would drive her to and from basketball practice. J.T. stated the abuse occurred "every day or every other day" at his home as she would go over to "hang out with [his niece] or because he [would] ask [her] to come over." She explained defendant "told [her] not to tell anyone or he would get in trouble."

J.T. also explained why she needed "more time to process what happened" and stated defendant only moved away from the neighborhood after more than a "month or so," following his arrest. She expressed defendant moving away made her feel "happy" because she no longer "ha[d] to see him when [she] walked outside." She explained that after processing her abuse, she had a second

11

interview with an officer in August 2022, where she recalled feeling "less guarded," "want[ing] to say and tell more," and "relieved that [she] told someone."

During cross-examination, defense counsel attempted to read the transcripts from J.T.'s initial statements to the investigating officers in March 2020. Following the State's objection, the court held a hearing pursuant to N.J.R.E. 104 where J.T. was questioned. With respect to the March 2020 interview, she testified she did not "remember what [she] said or what [the officer] asked [her], but . . . [she] could probably try to remember." Based on J.T.'s recollection, the parties agreed to admit "the recording and the transcript" of her statement to the investigating officer as a "past recollection recorded."

After the jury re-entered, the court experienced technical issues playing the recording, and the parties agreed to play an audio-enhanced version of the recording with a rolling transcript, instead of handing the jurors physical copies. Defense counsel played the recording of the March 2020 forensic video for more than forty minutes without interruption. In the recording, prompted by the officer's question, J.T. affirmed she was telling the truth, detailed her relationship with defendant, and explained her perspective of the Snapchat messages. She denied any sexual abuse but explained she thought defendant

12

viewed her as a "girlfriend" and confirmed defendant had "hugged and cuddled" her.

Judgment of Acquittal Ruling

At the close of the State's case, which included testimony from J.T.'s parents, the investigating officers, and J.T. herself, defendant moved for a judgment of acquittal under Rule 3:18-1 with respect to the charge for endangering the welfare of a minor by a caretaker. At the ensuing Reyes[2] hearing, defendant argued the evidence, including the Snapchat messages, do not "carry the day" because the evidence to convict defendant did not constitute "sexual conduct, and it has to be . . . that he knowingly commits the offense," to satisfy two of the necessary elements of a conviction under N.J.S.A. 2C:24-4(a)(1). He contended the Snapchat messages, while inappropriate, were insufficient to be "considered sexual conduct that would impair or debauch the morals of the child."

In its ensuing oral decision, the court denied defendant's motion and concluded the State presented sufficient evidence to proceed on the charges. With respect to defendant's state of mind, the court found it "can be gleaned from the totality of the evidence and the circumstances surrounding it," in light

---

[2] State v. Reyes, 50 N.J. 454 (1967).

of the Snapchat messages and the victim's testimony. As to the sexual conduct element, the court found the language of the Snapchat messages in addition to defendant's inappropriate conduct including touching and kissing the victim, as supported by her testimony, was sufficient to support the charge.

Ruling on Jury Instruction on Unanimity

As relevant to one of the issues on appeal, defendant objected at the charge conference to the court's proposed jury charge for endangering. He argued "six jurors cannot find that the language [of the Snapchat messages] constitutes sexual conduct, with six other jurors finding that there was touching." Rather, he contended the jury charge should include unanimity, and the court should provide a special interrogatory asking the jury: 1) "whether the language contained in the Snapchats proved beyond a reasonable doubt, that defendant endangered the welfare of a child"; and 2) "the same thing with regard to . . . sexual contact."

After considering the parties' arguments, the court rejected defendant's request for a special interrogatories and explained the jury "need only agree beyond a reasonable doubt that the conduct, whether singular or in the totality, meets the definition for a finding of beyond a reasonable doubt that [defendant's] conduct meets the statute." In the context of N.J.S.A. 2C:24-4(a)(1), the court

14

explained there were "a number of cases" that found "sexual conduct is not necessarily a sexual act in the context of sexual assault, sexual contact, or something along those lines." The court further observed its proposed jury charge allowed the jury to evaluate whether the "overall conduct itself could warrant a finding that . . . [it was] sexual conduct under the [N.J.S.A. 2C:24-4(a)(1)]."

The court ultimately instructed the jury, pursuant to Model Jury Charges (Criminal), "Endangering the Welfare of a Child, Sexual Conduct" (Second Degree) (N.J.S.A. 2C:24-4(a)(1)) (Rev. Apr. 2014), that it could convict defendant of this specific count if it concluded the State presented evidence to prove beyond a reasonable doubt that defendant "did endanger the welfare of J.T. . . . [s]pecifically by engaging in inappropriate sexual conversations and touching J.T.'s vagina and breasts over her clothing." (Emphasis added). After its instructions with respect to the specific counts, the court, indeed, advised that "[t]he verdict must represent the considered judgment of each juror and must be unanimous as to each charge. This means all of you must agree on whether the defendant is guilty or not guilty on each charge." The court also instructed the jury that they "may return on each crime charged a verdict of either not guilty or guilty. [Their] verdict, whatever it may be as to each crime charged, must be

A-2144-24

unanimous. Each of the [twelve] members of the deliberating jury must agree upon the verdict." After dismissing the jury to deliberate, the jury did not return any notes expressing any form of confusion with respect to the charge.

II.

A.

First, defendant argues the court erred in its decision to allow the victim's parents to testify under the fresh complaint doctrine. He contends "[t]he evidence offered was not [f]resh [c]omplaint," because the victim "had not been silent and had discussed the matter in detail during her first statement" in March 2020. He asserts "none of factors applicable to fresh complaint existed to allow [her] parents to testify about [the victim's] subsequent disclosures," particularly because he argues the victim had "spoke [at] length that nothing had happened." Further, he maintains the court's conclusion that J.T.'s subsequent disclosures to her parents in July 2022 were voluntarily "is belied by common sense and the testimony adduced during the hearing." Finally, he asserts the court's limiting instruction with respect to the fresh complaint testimony "compounded" the issue because it fell "upon deaf ears as it repeatedly [told] the jury she made out of court statements in proximity to the event." We disagree with all of these arguments.

"The determination [of] whether the fresh complaint rule's conditions of admissibility have been satisfied is committed to the discretion of the trial court." State v. C.W.H., 465 N.J. Super. 574, 600 (App. Div. 2021) (quoting State v. L.P., 352 N.J. Super. 369, 380-81 (App. Div. 2002)).  Accordingly, an appellate court will review such a determination for an abuse of discretion, which "may be found if the trial court made a 'clear error of judgment.'"  Ibid. (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

The fresh complaint doctrine is an exception to the hearsay rule recognized by our Supreme Court that "allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault."  State v. Hill, 121 N.J. 150, 157-63 (1990).  For the fresh-complaint doctrine to apply, the proponent of the evidence must establish:  (1) the victim of the sexual assault disclosed the crime to a natural confidante, whom the victim would ordinarily turn to for support; (2) the disclosure was spontaneous and voluntary; and (3) the disclosure was made within a reasonable time after the alleged assault.  State v. R.K., 220 N.J. 444, 455 (2015).

"[F]resh complaint evidence serves a narrow purpose. It allows the State to negate the inference that the victim was not sexually assaulted because of her [or his] silence."  Hill, 121 N.J. at 163.  "[T]he purpose of the rule is to prove

17

only that the alleged victim complained, not to corroborate the specifics of the victim's allegations."  State v. P.H., 178 N.J. 378, 393 (2004) (quoting State v. Bethune, 121 N.J. 137, 146 (1990)).  Thus, fresh complaint evidence is limited to "[o]nly the facts that are minimally necessary to identify the subject matter of the complaint."  R.K., 220 N.J. at 456; see Hill, 121 N.J. at 163 (explaining under the fresh complaint doctrine "[o]nly the fact of the complaint, not the details, is admissible").  Accordingly, fresh complaint evidence may not "corroborate the victim's allegations concerning the crime," and the court must "assess . . . whether repeated testimony of the victim's complaint is irrelevant or prejudicial to the defendant."  Hill, 121 N.J. at 169.  To this end, our Supreme court has explained "courts should instruct the jury of the limited role that fresh complaint evidence should play in its consideration of the case."  Bethune, 121 N.J. at 148.

Because children may be too embarrassed and scared to discuss sexual abuse, it is necessary to be flexible in the application of the fresh complaint rule for child victims of sex crimes.  Bethune, 121 N.J. at 143.  "[A] substantial lapse of time between the assault and the complaint may be permissible if satisfactorily explainable by the age of the victim and the circumstances surrounding the making of the complaint."  State v. Pillar, 359 N.J. Super. 249,

281-82 (App. Div. 2003). The lapse between a juvenile victim's complaint and the last act must be, however, adequately explained, State v. W.B., 205 N.J. 588, 617 (2011) (recognizing that the two-year delay was justified because the victim was "scared" and in a state of "open rebellion" against her mother), and longer delays typically require a showing of threats or coercion, see e.g., State v. Hummel, 132 N.J. Super. 412, 423 (App. Div. 1975) (noting that the reason for the victim's delay was because her abuser threatened to put her away in a shelter if she spoke); State v. L.P., 352 N.J. Super. 369, 382 (App. Div. 2002) (finding that the delayed complaint was justified because the victim "continued living with defendant . . . and defendant had warned [her] that he would kill her if she told anyone about the sexual abuse").

We are satisfied the court did not abuse its discretion in admitting J.T.'s parents' testimony under the fresh complaint doctrine. We are convinced, and defendant does not appear to contest, that both parents, including J.T.'s mother who testified to her intimate familiarity with her daughter's changing temperament during this critical period, were natural confidantes for her to disclose the extent and nature of her abuse. We further reject defendant's argument that her subsequent disclosures were not voluntary as dictated by "common sense." Rather, we are satisfied that J.T.'s disclosures were under her

19

own volition as supported by both parents' testimony who emphasized their intention to allow their daughter the space to process what she had endured.

Further, we also reject defendant's argument that J.T.'s disclosures were not within a reasonable time, particularly in light of the well-established principle of flexibility that is afforded to child victims, like J.T., who was twelve at the time the abuse began. Although we recognize J.T.'s disclosures culminated more than two years after the initial March 2020 incident, we are satisfied the court properly considered that her disclosures took place gradually, consistent with her mother's credible testimony that referenced specific conversations beginning in June 2020, only a few months after the initial interview. The court correctly concluded J.T. needed additional time to process what happened to her in light of her young age, tumultuous changes at home, and defendant's continuing presence in the neighborhood.

We are also unconvinced that J.T.'s subsequent disclosures were not, in fact, fresh complaints, in light of her alleged "extensive" denial of sexual abuse. We find no support in our case law for defendant's argument. Further, such a holding would ignore scenarios where victims may initially not acknowledge, or even deny, abuse but are later able to later communicate and discuss what they endured. Bethune, 121 N.J. at 139-40 (admitting fresh complaint testimony

after victim initially "denied having been sexually abused"); P.H., 178 N.J. at 384 (admitting testimony after victim "did not report the incidents . . . despite having numerous occasions [including] an investigation by the Division of Youth and Family Services"); L.P., 352 N.J. Super. at 376 (admitting testimony after victim was initially removed by the State "from defendant's home for reasons unrelated to sexual abuse").

In any event, although J.T. did not express the extent to which defendant abused her at the time of her initial interview in March 2020, she did, indeed, acknowledge some of defendant's physical and inappropriate conduct, as corroborated by the Snapchat messages. Finally, to the extent defendant takes issue with the court's limiting instruction with respect to the fresh complaint testimony, we reject defendant's argument that the instructions, which both parties approved, did not properly advise the jury to assess J.T.'s truthfulness and credibility, in light of the court's express instructions to do so.

## B.

Next, defendant contends the court erred in its decision to preclude defendant from introducing the physical transcripts of the victim's statements in her March 2020 interview. He argues the court "had no right to preclude the

defendant from using them for purposes of impeachment" because it is a prior inconsistent statement and emphasizes the State itself prepared these transcripts.

Our review of a trial judge's evidential rulings is "limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008) (citing Brenman v. Demello, 191 N.J. 18, 31 (2007)). "When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting Brown, 170 N.J. at 147). Therefore, "we will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Ibid. The same standard of review applies to a trial court's "determining both the relevance of the evidence to be presented [under N.J.R.E. 401] and whether its probative value is substantially outweighed by its prejudicial nature" under Rule 403. Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999); N.J.R.E. 401; N.J.R.E. 403; see also State v. Lykes, 192 N.J. 519, 534 (2007).

N.J.R.E. 803 governs the admissibility of prior statements. Under N.J.R.E. 803(a), a prior inconsistent statement of a trial witness is not excluded as hearsay if the statement would have been admissible if made while the witness

was testifying and was offered in accordance with N.J.R.E. 613.  When the prior inconsistent statement is offered by the party calling the witness, N.J.R.E. 803(a)(1) requires that the statement be "contained in a sound recording or . . . writing made or signed by the witness [under] circumstances establishing its reliability."  N.J.R.E. 803(a)(1)(A).

"[A] feigned lack of recollection is an inconsistency on which the admission of a witness's prior inconsistent statement may be based."  State v. Brown, 138 N.J. 481, 542 (1994).  When a witness claims a lack of memory of a prior inconsistent statement, if the court finds that it is "a feigned loss of memory," the statement may be admitted under N.J.R.E. 803(a)(1).  State v. Soto, 340 N.J. Super. 47, 66 (App. Div. 2001) (citing Brown, 138 N.J. at 544). In those circumstances, "[t]he jury is free to believe the version of the events in the statement or the version presented at trial."  Ibid. (citing Brown, 138 N.J. at 542).

We are satisfied the court did not abuse its discretion in deciding to admit the recording and rolling transcript of the March 2020 forensic interview in place of the actual transcript, particularly in light of defense counsel's agreement to admit the recording and rolling transcript.  We disagree with defendant's contention that the physical transcript was necessary as the jury listened to more

23

than forty minutes of the recording with a rolling transcript. We are also satisfied that that the court did not otherwise abuse its discretion in the manner in which it addressed the cross-examination of J.T. The record indicates defense counsel fully cross-examined J.T., including asking her numerous questions with respect to the March 2020 interview.

C.

In his third point, defendant maintains the court erred in denying his motion for a judgment of acquittal because the evidence was "[in]sufficient to establish [e]ndangering the [w]elfare of a [c]hild in violation of N.J.S.A. 2C:24-4[(a)(1)]." With respect to the Snapchat messages, defendant argues there is not "a single case where words alone were sufficient to constitute sexual conduct." He asserts there was "nothing overtly sexual about the content" of those messages such that a reasonably jury could conclude defendant knowingly "engaged in sexual conduct." We note defendant does not appear to challenge any other element of this crime besides the element for sexual conduct and we accordingly consider any other argument waived. See Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting

the contention in its brief); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026) ("[A]n issue not briefed is deemed waived.").

We conduct a de novo review of a court's denial of a motion for a judgment of acquittal at the close of the State's case pursuant to Rule 3:18-1. State v. Josephs, 174 N.J. 44, 81 (2002). Under the Rule, a court shall enter a judgment of acquittal at the close of the State's case on the defendant's motion or its own initiative "if the evidence is insufficient to warrant a conviction." R. 3:18-1.

In State v. Reyes, our Supreme Court established the following standard to determine if the State presented adequate evidence to survive a motion for acquittal under Rule 3:18-1:

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
> [50 N.J. at 459.]

In our review of an order denying a motion for a judgment of acquittal, "the relevant question is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Josephs, 174 at 81 (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319

(1979)).  We "must consider the State's proofs in light of the [Reyes] standard and . . . determine therefrom how the motion should have been decided."  Ibid. (alteration in original).

N.J.S.A. 2C:24-4(a)(1) provides:

> Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree.  Any other person who engages in conduct or who causes harm as described in this paragraph to a child is guilty of a crime of the third degree.

Sexual conduct is not defined in N.J.S.A. 2C:24-4(a)(1) but has been interpreted as including those things prohibited by both N.J.S.A. 2C:14-2(a) and N.J.S.A. 2C:14-2(b).  State v. Perez, 177 N.J. 540, 553 (2003) ("Although the term 'sexual conduct' is not defined, clearly included are sexual assaults and sexual contact").  In addition, courts have held that N.J.S.A. 2C:24-4(a)(1) permissibly criminalizes a variety of conduct that is neither a sexual assault nor sexual contact.  See State v. White, 105 N.J. Super. 234, 237 (App. Div. 1969) (showing nude photos to a child); State v. Hackett, 323 N.J. Super. 460, 472 (App. Div. 1999) (being nude in a window where defendant could be seen by children); State v. Maxwell, 361 N.J. Super. 502, 517-18 (Law Div. 2001), aff'd o.b., 361 N.J. Super. 401 (App. Div. 2003) (engaging in a telephone

conversation with children about their private parts, oral sex, and other similar topics); State v. McInerney, 428 N.J. Super. 432, 451 (App. Div. 2012) (offering to pay children to report their sexual activities); State v. Johnson, 460 N.J. Super. 481, 494-95 (Law Div. 2019) (asking a child to send a photo of her breasts).

As relevant to the appeal before us, defendant must have also engaged in sexual conduct knowingly. While not defined in N.J.S.A. N.J.S.A. 2C:24-4(a)(1) specifically, our Criminal Code defines "knowingly" as follows:

> A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result.
>
> [N.J.S.A. 2C:2-2(b)(2).]

We are satisfied there is sufficient evidence in the record that a reasonable jury could convict defendant of child endangerment by sexual conduct of a caretaker. We reject defendant's contention that his conviction is entirely dependent upon the Snapchat messages and that the record, beyond the Snapchat messages, does not include sufficient evidence to support the jury's finding. In addition to the Snapchat messages, which in of itself are sexual and explicit, we

27

are satisfied the record is replete with references to defendant's repeated and frequent physical sexual conduct toward the victim including touching her legs, waist, buttocks, and vaginal area, as confirmed by her testimony and the August 2022 supplemental report. In light of J.T.'s testimony, we discern that the messages in addition to defendant's physical abuse formed the basis for which the jury made its decision.

To the extent defendant argues he did not act knowingly, we conclude this argument lacks sufficient merit to warrant further discussion in a written opinion, in light of her testimony and the Snapchat messages, which directly explain defendant's desires and intentions upon which he acted. See R. 2:11-3(e)(2).

### D.

In his fourth point, defendant maintains that the court erred in failing to provide a "unanimity" charge and refusing to include special interrogatories separating the two alleged acts in the indictment. Specifically, he maintains the State's charge on the superseding indictment provided defendant committed the offense "by engaging in inappropriate sexual conversations and touching J.T.'s vagina and breasts." (Emphasis added). He contends requiring unanimity would have clarified whether "the defendant endanger[ed] the child by touching or . . .

28

endanger[ed] the child by the communications." Both arguments are contrary to the record and substantively without merit.

We consider defendant's challenge to the jury charges, recognizing "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). "The proper standards of review of jury instructions are well-settled: if the party contesting the instruction fails to object to it at trial, the standard on appeal is one of plain error; if the party objects, the review is for harmless error." State v. Cooper, 256 N.J. 593, 607 (2024) (quoting Willner v. Vertical Reality, Inc., 235 N.J. 65, 80 (2018)).

A harmless error occurs when there is "some degree of possibility that [the error] led to an unjust result." State v. Baum, 224 N.J. 147, 159 (2016) (alteration in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)). "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached." Cooper, 256 N.J. at 608 (alteration in original) (quoting Baum, 224 N.J. at 159). We note that "[e]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." State v.

McKinney, 223 N.J. 475, 495-96 (2015) (alteration in original) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

Rule 1:8-9, which has constitutional underpinnings, see State v. Parker, 124 N.J. 628, 633 (1991), requires that a "verdict shall be unanimous in all criminal actions." As a result, courts must be vigilant in ensuring that guilty verdicts are not rendered on a jury's "patchwork" view but on a "shared" view of the evidence. Id. at 636-37.

In this regard, the Parker Court recognized that "the unanimous jury requirement 'impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue.'" Id. at 633 (quoting In re Winship, 397 U.S. 358, 364 (1970)). Our Supreme Court has further recognized that juries must be unanimous on the "material facts" and "only common sense and intuition can define the specificity with which the jury must describe the defendant's conduct before it may convict." Parker, 124 N.J. at 634 (quoting Note, Right to Jury Unanimity on Material Fact Issues: United States v. Gipson, 91 Harv. L. Rev. 499, 502 (1977)). To determine whether a unanimity charge is required, courts analyze two factors: (1) "whether the alleged acts are conceptually similar or are 'contradictory or only marginally related to each other'"; and (2) "whether there is a 'tangible indication of jury confusion.'" State

v. Macchia, 253 N.J. 232, 257 (2023) (quoting State v. Gandhi, 201 N.J. 161, 193 (2010)).

While providing a broad rule that a specific instruction on unanimity should be given "in cases where there is a danger of a fragmented verdict," in most such instances, a general unanimity instruction will suffice without any special additional instructions. State v. Frisby, 174 N.J. 583, 597-98 (2002). Such a special instruction only may be needed in situations where:

> (1) a single crime could be proven by different theories supported by different evidence, and there is a reasonable likelihood that all jurors will not unanimously agree that the defendant's guilt was proven by the same theory; (2) the underlying facts are very complex; (3) the allegations of one count are either contradictory or marginally related to each other; (4) the indictment and proof at trial varies; or (5) there is strong evidence of jury confusion.
>
> [State v. Cagno, 211 N.J. 488, 517 (2012) (quoting Parker, 124 N.J. at 635-36).]

When a series of alleged criminal acts committed by a defendant involve acts that are "conceptually similar," no special jury instruction on unanimity is required to segregate those acts. Parker, 124 N.J. at 639. For example, in State v. T.C., 347 N.J. Super. 219, 223 (App. Div. 2002), the defendant engaged in several forms of physical abuse and negligence of her son over a period of roughly fifteen months, and the court accordingly provided a disjunctive

31

instruction with respect to these forms of abuse. Because "there was no indication of juror confusion, nor were there two separate theories being submitted to the jury[,]" there was no need for an unanimity instruction, and no error by its omission. Id. at 243. This was true even though jurors may have convicted the defendant on her commission of different acts: "[t]here was but one theory of ongoing emotional and physical abuse over a period of time[.]" Ibid.; see also State v. Kane, 449 N.J. Super. 119, 127-42 (App. Div. 2017) (where defendant assaulted victim on different occasions causing multiple injuries, no unanimity instruction was necessary because defendant's conduct was a "continuum of violence.").

With respect to special interrogatories, our Supreme Court has held their use in criminal cases is "discouraged" because they have the potential to "destroy[] the ability of the jury to deliberate upon the issue of guilt or innocence free of extraneous influences." State v. Hill, 182 N.J. 532, 548 (2005) (quoting State v. Diaz, 144 N.J. 628, 643-44 (1996)); see also State v. Simon, 79 N.J. 191, 199-200 (1979) (holding the use of special interrogatories may not "proselytize the jury to the guilt of a defendant"). As we have held, a special interrogatory should only be used in a "rare case where there is a compelling need . . . ." State v. McAllister, 211 N.J. Super. 355, 363 (App. Div. 1986).

A-2144-24

The court did not err in its decision to not provide a special interrogatory with respect to the charge for endangering charge.[3] First, we reject defendant's argument that the court did not require unanimity in light of the record that reveals the court explained to the jury, on multiple occasions, that it must reach its decision unanimously. Second, to the extent defendant asserts that the court's instruction could lead to a fragmented verdict in light of the conjunctive allegations in the indictment, we note the court, indeed, provided a conjunctive instruction that required the jury to convict defendant only if they found defendant committed sexual conduct "by engaging in inappropriate sexual conversations <u>and</u> touching J.T.'s vagina and breasts over her clothing." (Emphasis added). Accordingly, we reject defendant's reliance on <u>Frisby</u>, 174 N.J. at 588-89, a case where the court provided a disjunctive instruction in light of the State's "two separate contentions . . . to meet the burden of proof on the third element." Further, we note the findings underlying the jury's conviction for sexual assault also support its findings for the endangering charge, specifically with respect to the sexual conduct element. <u>See</u> <u>Perez</u>, 177 N.J. at 553 ("Although the term 'sexual conduct' is not defined, clearly included are sexual assaults and sexual contact").

---

[3] We note the jury's verdict sheet is not in the record before us.

To the extent the defendant contends the court's conjunctive instruction was insufficient and should have explicitly provided a special interrogatory, we are satisfied defendant's alleged conduct, including the explicit conversations over Snapchat and frequent sexual touching, which occurred over the same period of time, constituted an ongoing pattern of sexual conduct such that a special interrogatory was not necessary, particularly given the concerns with them in criminal cases. We accordingly reject defendant's argument that a special instruction or interrogatory was required because these allegations were neither confusing nor contradictory, supported by the jury's apparent lack of confusion.

E.

In his last point and for the first time on appeal, defendant argues, there is insufficient evidence to convict him of the charge for sexual assault of a minor below the age of thirteen. He contends the State introduced no evidence to determine the date for which any "sexual contact" with "intimate parts" took place. He maintains, although the victim testified that defendant "touched her vagina when she was walking up the steps on one occasion, there was no evidence as to when that event occurred." He contends "there was no evidence

34

that the jury could conclude" that defendant sexually assaulted the victim. Again, we disagree.

As a threshold matter, when a party does not properly preserve an issue for appeal, we may nonetheless consider whether it rises to the level of plain error under Rule 2:10-2. State v. Clark, 251 N.J. 266, 286-87 (2022). Such a high bar "requir[es] reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 (2020) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

N.J.S.A. 2C:14-2(b) states: "An actor is guilty of sexual assault if he commits an act of sexual contact with a victim who is less than [thirteen] years old and the actor is at least four years older than the victim." N.J.S.A. 2C:14-1(d) defines "sexual contact" as:

> an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor. Sexual contact of the actor with himself must be in view of the victim whom the actor knows to be present.

Our Supreme Court has interpreted these statutes to cover three types of scenarios: a defendant touching himself, a defendant touching a victim, and a

35

victim touching a defendant.  State v. Zeidell, 154 N.J. 417, 428 (1998). The Court explained a sexual assault under N.J.S.A. 2C:14-2(b) contains three key elements: "(1) a victim who is less than thirteen years old, (2) a defendant-actor who is at least four years older than the victim, and (3) a sexual contact with a victim under the critical age." Ibid.  With respect to sexual contact element, the Court concluded sexual contact with a victim "involves an intentional or purposeful touching of an intimate part," where "the actor may touch himself or herself, the actor may touch the victim, or the victim may touch the actor." Ibid.

Here, we discern no error, plain or otherwise, with defendant's conviction. In light of J.T.'s August 2022 interview and her testimony, the record is replete with allegations of sexual contact when J.T. was less than thirteen years old, most notably the incident in defendant's basement before Halloween in October 2019.  We disagree with defendant's contention that there was no evidence of when this event took place because J.T. testified to her demeanor following the incident and the circumstances surrounding the event including the time of year, notably Halloween.  Further, J.T.'s testimony with respect to other incidents that occurred while she spent time at defendant's home and when defendant would take her to basketball practice independently support the jury's finding.

To the extent we have not addressed any of the parties' remaining arguments, it is because we have determined they lack sufficient merit to warrant discussion in a written opinion.  See R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2144-24